RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2004 FED App. 0252P (6th Cir.)
File Name: 04a0252p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

GALEN BECK, as
representative of the estate of
Eugene Beck; and SHARON
BECK,

      *Plaintiffs-Appellants,*

        *v.*

EDWARD A. HAIK,
individually and officially for
Manistee County; and
ROBERT C. HORNKOHL,
individually and officially as
Director of Public Safety for
City of Manistee,

      *Defendants,*

MANISTEE COUNTY; and CITY
OF MANISTEE,

      *Defendants-Appellees.*

No. 01-2723

Appeal from the United States District Court
for the Western District of Michigan at Grand Rapids.
No. 97-00533—Robert Holmes Bell, Chief District Judge.

Argued: June 18, 2003

Decided and Filed: July 29, 2004

Before: BOGGS, Chief Judge; GILMAN, Circuit Judge;
and MARBLEY, District Judge.[*]

———————————

## COUNSEL

**ARGUED:** Mark R. Bendure, BENDURE & THOMAS, Detroit, Michigan, for Plaintiffs. Joseph Nimako, CUMMINGS, McCLOREY, DAVIS & ACHO, Livonia, Michigan, Mary Massaron Ross, PLUNKETT & COONEY, Detroit, Michigan, for Defendants. **ON BRIEF:** Mark R. Bendure, BENDURE & THOMAS, Detroit, Michigan, Grant W. Parsons, PARSONS, RINGSMUTH, Traverse City, Michigan, for Plaintiffs. Joseph Nimako, CUMMINGS, McCLOREY, DAVIS & ACHO, Livonia, Michigan, Mary Massaron Ross, PLUNKETT & COONEY, Detroit, Michigan, for Defendants.

———————————

## OPINION

———————————

BOGGS, Chief Judge. The plaintiffs in this 42 U.S.C. § 1983 civil rights suit appeal from the judgment entered against them after a jury verdict for the defendants. The plaintiffs challenge the correctness of several of the district court's rulings on the admission of evidence and other trial matters, and argue that the effect of these rulings substantially prejudiced their case. Though we do not accept all of the plaintiffs' contentions, we agree that a number of errors occurred, and that these were sufficiently prejudicial to require a new trial. We therefore reverse and remand.

———————————

[*] The Honorable Algenon L. Marbley, United States District Judge for the Southern District of Ohio, sitting by designation.

## I

This case arose from the June 28, 1995, drowning death of Eugene Beck, who dropped from a bridge (apparently after jumping) into the Manistee River in Manistee, Michigan. The plaintiffs contend that Mr. Beck died because officials of the City and County of Manistee, pursuant to a municipal policy, prevented qualified civilian rescue divers on the scene from saving him, even though the city and county provided no meaningful alternative rescue service of their own. In an earlier, unpublished, opinion, *Beck v. Haik*, No. 99-1050, 2000 WL 1597942 (6th Cir. Oct. 17, 2000), we held that these allegations, if proven, were jointly sufficient to establish a claim under 42 U.S.C. § 1983 for violation of Beck's due process rights under the Fourteenth Amendment. 2000 WL 1597942 at *4. We upheld the district court's grant of summary judgment dismissing plaintiffs' other claims. *Id.* at *9.

On remand, the district court held a seven-day trial. Each element of the plaintiffs' case was significantly contested: (1) whether the defendants city and county had a policy that prevented private rescuers from assisting Mr. Beck; (2) whether the rescue services made available by the defendants were sufficiently effective to constitute a "meaningful alternative" to private rescue; and (3) whether the Becks were able to show causation, by establishing that Mr. Beck would likely have lived if private rescuers had been allowed to dive after him.

The following facts emerged at trial. In 1993, the Manistee County Sheriff's Department formed a county dive team. The sheriff's department concluded after consultation with an expert that the county was too large to permit this dive team to be held out to the public as a "rescue" team; instead, it was deemed a "recovery" team. There was evidence that this term connoted the simple recovery of bodies, rather than the rescue and resuscitation of drowning victims. For a time, the only member of the dive team was then-deputy sheriff Dale

Kowalkowski, who was not formally trained or certified in dive rescue. By the time of Mr. Beck's plunge, it included several officers who were certified in diving, but not in dive rescue.

After a fatal drowning accident in the Manistee River in 1993, a group of trained civilian divers formed a private rescue organization called the Manistee Search and Rescue Dive Team ("MSRDT"). The MSRDT entered into a contract to provide rescue and recovery services to the City of Manistee as needed. The members of the MSRDT carried pagers, which the city authorities could use to summon the MSRDT. A protocol developed whereby the City would page the county dive team first in case of a water emergency, and would call out the MSRDT if the county team was likely to have difficulty responding promptly. However, a city memorandum on this subject, produced at trial, included a handwritten annotation that "Sheriff Ed" would "decide" when the MSRDT would be called out – apparently a reference to then-Sheriff Edward Haik.[1]

The plaintiffs presented evidence that some local officials were hostile to the MSRDT's activities. Art Krause, the founder of the MSRDT, testified that Sheriff Haik personally told him that he would be subject to arrest if he interfered with the county's operations at a water accident scene. Michael Mosack, a Michigan State Police trainee and also a member of the MSRDT, likewise testified that Haik threatened him with criminal charges if he entered the water at an accident scene. Fred LaPoint, a City of Manistee firefighter and another MSRDT member, testified that he had seen a memo from Manistee County Sheriff Edward Haik stating that all water accident scenes were to be treated as

---

[1] Sheriff Haik was originally named in the Becks' complaint as a defendant in his individual capacity. The district court granted him (and the other individual defendant, Chief Hornkohl) summary judgment on the ground of qualified immunity. We affirmed that ruling in the Becks' previous appeal. *Beck*, 2000 WL 1597942 at *7.

"crime scenes," and that anyone who entered such a scene without his permission would be subject to arrest. While no official copy of the alleged memo was produced at trial, several other witnesses acknowledged that they had either seen or heard of such a memo. Sergeant Douglas Cermak of the Sheriff's Department dive team testified that he had seen a "crime scene" memo, and that Haik had instructed him to take "appropriate action" if the MSRDT interfered with a county dive operation. On the other hand, the defendants presented testimony from several local township fire chiefs who worked with Sheriff Haik, and stated that they had never heard of such an "arrest policy."

Beck and another man, Mark Sander, plunged into the Manistee River at approximately 10:07 p.m. on June 28, 1995. A bystander saw their fall and immediately called 911. The county dispatcher called personnel from the Manistee Police Department, the Manistee Fire Department, and the Manistee County Sheriff's Department Dive Team (the "county dive team") to the scene.

The Manistee police arrived in time for one of the officers to see Beck disappear beneath the river's surface at 10:17 p.m. They notified both Manistee Police Chief Robert Hornkohl and the county dive team.

The city did not page the MSRDT that night. However, Michael Mosack, a member of the MSRDT who was a Michigan State Police trainee and a certified diver, overheard the original 911 call reporting Beck's plunge. Mosack immediately gathered his diving equipment, put on the lower half of his wet suit, and drove to the scene. Mosack estimated that he arrived between 10:19 and 10:22 p.m., no more than five minutes after Beck went under the water. Another MSRDT diver, Gordon Cole, learned of the situation by overhearing the dispatcher's call to the fire department. Cole drove to the scene with his equipment and arrived shortly before Mosack did.

Firefighter LaPoint also responded to the call. LaPoint drove to the scene in a city rescue ambulance designated R5. However, LaPoint testified that shortly after he arrived, he received another call telling him that R5 had been "released." This, he said, implied that the accident was no longer considered a rescue scene, but was instead a body recovery scene. LaPoint left the scene shortly thereafter.

Meanwhile, a Coast Guard boat arrived on the scene at 10:27 p.m. The local Coast Guard officer, Chief Timothy Monck, would later testify in a deposition that the Guard had learned of the incident by a phone call from a private citizen.

The county dive team also responded to the call. Then-Sergeant Douglas Cermak, a member of the sheriff's department, was driving a patrol car with his partner Jim Doerning when a call from the dispatcher alerted him that Beck was in the river. Cermak proceeded to the sheriff's office, where he and Doerning gathered their diving equipment. Cermak also put on part of his wet suit. The men left the sheriff's office at 10:33 p.m. Cermak estimated that it took him only a couple of minutes to drive from the sheriff's office to the river and the scene of the accident.

At the scene, a partially suited-up member of the MSRDT – apparently Mosack – approached Cermak and asked if the county team needed help. Cermak told him that the county "had everything under control." Moreover, Mosack testified that he approached Chief Hornkohl and told him that the MSRDT was ready to attempt a rescue. He testified that Hornkohl consulted with Sheriff Haik by radio, and then instructed the divers not to enter the water. However, Hornkohl contradicted this version of events, testifying that he was never aware that MSRDT divers were on the scene. Sheriff Haik likewise denied having any such conversation with Hornkohl. Cole testified that he did not see Chief Hornkohl at the scene.

Eugene Beck's mother, Sharon Beck, eventually arrived at the scene. Firefighter LaPoint physically restrained her to prevent her from attempting to rescue Eugene herself.

Although the accident scene was quite close to the sheriff's office (about a two-minute drive), the county divers did not enter the water until 11:05 p.m., nearly one hour after Mr. Beck's plunge. Cermak and Doering held on to a tow bar attached to the sheriff's boat. The boat experienced mechanical difficulties with its lights and radio, but it proceeded into the water. The boat slowly canvassed the river, which was slightly less than 30 feet deep. The water temperature in the river, as measured by the divers' equipment, was 68 degrees. Cermak testified that this reading was an average, and that the temperature at the river bottom was likely somewhat colder.

Cermak and Doering located Beck on the floor of the river, close to the "last seen" point where he had submerged. Cermak grasped him by the body and surfaced with him approximately 14 minutes after the county divers had entered the water. The county divers were unable to hoist Beck into the sheriff's boat, and instead transferred him onto the Coast Guard boat, with some difficulty, as will be discussed momentarily. The personnel on the boat began CPR and other resuscitative measures as they returned Beck to the shore and a waiting ambulance. However, Beck did not survive.

Chief Monck, the Coast Guard officer who assisted with the recovery of Beck, testified in a deposition read to the jury that the county divers placed Beck inside a body bag underwater, and zipped up the bag with Beck in it. Cermak testified somewhat differently: he stated that he asked for a porous mesh bag to use as a sling to lift Beck, but was instead given a body bag. As the county and Coast Guard personnel tried to place Beck partially into the bag to hoist him onto the boat, he testified, the bag filled with water and he had to cut it open with a knife. Cermak's testimony that the divers did not place

Beck in a bag underwater was in some tension with his deposition, in which he had said that the bag containing Beck was "zip[ped] up" at the time the county dive team lifted him into the boat.

Gordon Cole, a defense witness, testified under cross-examination that he saw the county dive personnel lift Beck out of the water by his ankles. He testified that the use of a body bag, and the practice of drawing a victim out of the water feet-first, were inconsistent with standard procedures for a live drowning rescue.

Mosack testified that he did not enter the water on the night of the accident because he feared being arrested under the policy that Sheriff Haik had allegedly announced. Cole, on the other hand, testified that such a policy would not have deterred him from attempting a rescue if he had thought he had a good chance of rescuing the victim. He testified that he refrained from entering the water on the night of June 28 simply because the officers on the scene had told him that the MSRDT was not needed.

Mosack estimated that if he had dived after Beck, he could have been in the water by 10:22 p.m., five minutes after Beck submerged. He estimated that he could then have swum to Beck's "last seen" location, brought him to the surface, and swum back with him in three to six minutes. Thus he would have been able to return Beck to the shore within approximately ten minutes of his original submergence.

The plaintiffs bolstered their case with the expert testimony of Dr. Alan Steinman, a former Coast Guard rear admiral and the author of numerous articles in the fields of cold-water drowning and resuscitation. Steinman had also studied hundreds of drowning cases in his official capacity at the Coast Guard. He opined that if Beck had been recovered as late as 24 minutes after submerging, he probably could have been resuscitated. (In his deposition, he had testified that the

cut-off time after which Beck probably would not have survived was between 20 and 30 minutes after submersion.)

Steinman testified that his opinion was based on numerous published articles, particularly the work of Dr. Martin Nemiroff, a researcher who had compiled case studies of cold-water drowning victims who had been revived after long periods of submersion, and concluded that cold water prompts special physiological responses that increase survivability. In Beck's favor were the facts that he was relatively young (age 28) and that his accident occurred in cold water (defined as less than 70 degrees Fahrenheit). Steinman testified that contemporary professional standards, as adopted by the American Heart Association and other national bodies, recommend that rescuers should make aggressive efforts to resuscitate cold-water drowning victims who had been submerged for as long as 60 minutes. This "golden hour" was generally viewed as marking the outer limit of survivability.

Steinman admitted on cross-examination that the most pronounced increases in survivability in cold-water drownings tended to occur with victims younger than Beck. He also admitted that if Beck had jumped into the water with suicidal intent, as some of the evidence suggested, then this would have decreased his chances of survival. Steinman also admitted that Dr. Nemiroff's research had identified only about 50 cases of very long-term survival in about 1500 Coast Guard drowning case studies. However, Steinman contended that many of these cases involved periods of submersion much longer than the 24-minute period in which, he believed, Beck probably could have been revived.

The County countered Dr. Steinman's testimony with the expert testimony of Dr. Christopher Dueker, a diver and a specialist in underwater medicine. Dr. Dueker opined that even if Beck had been recovered within 15 minutes of submerging, it would have been "unexpected" for him to survive, and he would likely have suffered brain damage. By 30 minutes, his chances of survival would be "vanishingly

small." Dr. Dueker criticized as unscientific the Nemiroff research on which Dr. Steinman had partially relied, because it was based simply on case studies. He noted that other peer-reviewed research in the field supported much shorter survival times in drowning victims. Dueker also testified, based on his experience as a diver, that a diver who, like Mosack or Cole, arrived at an accident scene before fully suiting up, would normally take 10 to 15 minutes to don his equipment and enter the water.

At the close of their case-in-chief, the plaintiffs called Sharon Beck, the deceased's mother. Mrs. Beck testified to a close relationship with her son, and recounted feeling anger and frustration at what she perceived as the county and city's indifference to rescuing him. She testified that she was undergoing ongoing counseling for this loss. On cross-examination, defense counsel questioned Mrs. Beck about her relationship with her son, eliciting testimony that he had an alcohol problem and that the relationship between Beck and his father was sometimes difficult. At one point, counsel asked Mrs. Beck if she was in counseling for other reasons besides her son's death. He then elicited, over the strenuous objection of plaintiffs' counsel, testimony that Mr. and Mrs. Beck had been accused of child molestation. These accusations were apparently abandoned after Mrs. Beck passed a lie detector test. Plaintiffs' counsel moved for a mistrial, which was denied.

In addition to the evidence presented at trial, as discussed above, the plaintiffs attempted to enter several other pieces of evidence dealing with the county's response. These were rejected by the district court.

First, plaintiffs argued that they were entitled to present evidence that the county destroyed the audio dispatch tape of the evening's events despite receiving a Freedom of Information Act request for it. The dispatch tapes, the plaintiffs contended, would have confirmed the sequence of events on that night, and would have included transmissions

between officers that were absent from the written dispatch log. The county regularly maintained tapes for thirty days, then demagnetized and reused them unless a request to preserve the tape came in. Near the end of the 30-day period, an attorney (not a participant in this case) filed a request with the Sheriff's Department for a copy of the tape containing Beck's accident. However, the request was not transferred to the dispatcher's office in time, and the tape was demagnetized on the 30th day. After a separate hearing, the district court held that plaintiffs had provided no evidence of deliberate destruction, and excluded the proffered testimony as irrelevant.

Second, plaintiffs proffered a letter that Coast Guard Chief Monck had written to Cheryl Debano-Griffin, the Manistee County dispatch director, shortly after the Beck drowning. In the letter, Monck expressed dismay that the county had failed to notify the Coast Guard of Beck's plunge. He stated that the Guard could have responded in two minutes, but due to the lack of notification, the Guard arrived at the accident 25 minutes later, after a call from a private citizen. Monck added: "In many instances, the difference between the rescue of a cold water near drowning victim and a body recovery is the timely notification of available rescue agencies." The district court had previously quashed plaintiffs' attempt to subpoena Monck, on the ground that he was a military serviceman. However, Monck supported the letter with an affidavit attesting to its accuracy. The letter had another notable feature: a handwritten annotation that read, "cut tape." The plaintiffs argued that this annotation must have been made by the county dispatcher who received the letter, and that it was relevant to plaintiffs' claim of spoliation.

The district court first held this letter inadmissible as hearsay. Then, when Monck filed his affidavit, the court reconsidered its ruling and held the letter inadmissible due to a lack of relevancy. It reasoned that the letter dealt with matters collateral to Beck's drowning. Moreover, it reasoned, even if the letter tended to show that the defendants' rescue

efforts were less than ideally effective, this was not relevant to any of the elements of plaintiffs' case.

Third, the plaintiffs attempted to introduce the opinion testimony of Steven J. Linton, an experienced dive rescue instructor and the author of many textbooks and articles on the subject. Linton evaluated the municipal policies for water accidents at the time of Beck's drowning, and severely criticized the defendants' actions. He would have testified that the use of a tow bar was inappropriate for a rescue scenario like Beck's, in which would-be rescuers had a good "last seen" point. He also criticized the county divers' lengthy delay in entering the water, the use of a body bag to recover Beck, and the decision to send LaPoint's rescue ambulance, R5, back from the scene before Beck had been recovered. Linton concluded from the county's and city's activities that "the officials intended not to rescue Beck, but simply recover his body." Finally, Linton would have testified that if Mosack and Cole had been permitted to enter the water and dive at the "last seen" point, they would likely have had little difficulty finding Beck. Linton opined on causation in his deposition, indicating that if Mosack and Cole had been allowed to dive, Beck would have survived.

As with the Monck letter, the district court excluded Linton's proffered testimony as irrelevant. It reasoned that "the issue [of whether] this was a perfect rescue operation" was not raised by the trial. Moreover, the court concluded that "Mr. Linton as this case is focused cannot help the jury evaluate th[e] question of whether or not this policy or practice in fact caused death."

At the close of all evidence, the district court instructed the jury on the three elements of the plaintiffs' case as follows:

First, that the plaintiffs' decedent, Eugene Beck, was arbitrarily deprived of his right to private rescue pursuant to the [defendants'] custom, policy, ordinance, regulation, or decision preventing private rescue efforts.

Second, that the defendant[s] . . . did not provide a meaningful alternative to private rescue efforts.

Third, that the defendant[s'] actions were a proximate cause of the damages sustained by the plaintiffs' decedent, Eugene Beck.

The plaintiffs objected to use of the word "preventing" in the first element of this instruction. They noted that this court's earlier opinion had used the term "hinder" to describe the kind of government interference with private rescue that a plaintiff was required to show. The district court overruled this objection. Plaintiffs' counsel argued in his closing that "prevent" did not necessarily mean physical restraint, but merely to "hinder" or "deter" a rescuer.

The jury received the case on November 21, 2001. At one point during deliberations, the jurors sent a note to the court, asking the court to define the term "arbitrary" as used in the instructions. At the urging of the plaintiffs, the district court declined to supply a definition, telling the jury that the term had its ordinary and common meaning in the instructions.

After four hours of deliberation, the jury returned a general verdict for the defendants.

The plaintiffs now appeal, arguing that the district court committed several evidentiary errors that collectively require reversal.

## II

This case turns in part on the application of the "harmless error" standard that governs mistakes in the admission or exclusion of evidence at trial. This standard is embodied in several provisions. The Federal Rules of Evidence state that erroneous rulings are grounds for reversal only when "a substantial right of [a] party is affected." Fed. R. Evid. 103(a); *Rye v. Black & Decker Mfg. Co.*, 889 F.2d 100, 103

(6th Cir. 1989). The Federal Rules of Civil Procedure use similar language. *See* Fed. R. Civ. P. 61 ("No error in the admission or exclusion of evidence . . . is ground for . . . disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice."). Another provision in the same vein appears in the federal judicial code, and applies by its terms to all proceedings in the courts of appeals: "On the hearing of any appeal . . . , the court shall give judgment . . . without regard to errors . . . which do not affect the substantial rights of the parties." 28 U.S.C. § 2111. In *McDonough Power Equip., Inc. v. Greenwood*, 464 U.S. 548 (1984), the Supreme Court held that the "substantial rights" language of § 2111 "incorporates the same principle as that found in [Civil] Rule 61," *id.* at 554, which speaks of "substantial justice." Fed. R. Civ. P. 61.

The "substantial right" standard may elude exact definition, *see* Charles Wright, Arthur Miller, & Mary Kay Kane, Federal Practice & Procedure: Civil 2d § 2883 (1995 & Supp. 2004), but our court has explained it in the following terms, in a case in which we held that reversible error had occurred:

Th[e] inquiry involves an assessment of the likelihood that the error affected the outcome of the case. As the Supreme Court has described the test: "[I]f one cannot say, with fair assurance, . . . that the judgment was not substantially swayed by the error, it is impossible to conclude that substantial rights were not affected." *Kotteakos v. United States,* 328 U.S. 750, 765, 66 S.Ct. 1239, 1248, 90 L.Ed. 1557 (1946). Application of this test is highly sensitive to the unique context of the particular case, including the one-sided or closely balanced nature of the evidence bearing upon the issue which the error arguably affected, and the centrality of that issue to the ultimate decision.

*Schrand v. Federal Pacific Elec. Co.*, 851 F.2d 152, 157 (6th Cir. 1988) (quoting *Jordan v. Medley*, 711 F.3d 211, 218-19 (D.C. Cir. 1983)) (some citations omitted).

That is the traditional formulation of the harmless error standard, deriving from *Kotteakos v. United States*. It calls for reversal when the appellate court lacks a "fair assurance" that the outcome of a trial was not affected by evidentiary error. We have applied this standard in civil cases, *Schrand*, *ibid.*, habeas corpus proceedings, *Caldwell v. Bell*, 288 F.3d 838, 842 (6th Cir. 2002), and criminal cases, *United States v. Haywood*, 280 F.3d 715, 724 (6th Cir. 2002). It is also followed by most other circuits in both civil and criminal cases alike. *E.g.*, *Bacou Dalloz USA, Inc. v. Cont'l Polymers, Inc.*, 344 F.3d 22, 29-30 (1st Cir. 2003); *Taylor v. Va. Union Univ.*, 193 F.3d 219, 235 (4th Cir. 1999) (en banc); *Williams v. U.S. Elevator Corp.*, 920 F.2d 1019, 1022-23 (D.C. Cir. 1990); *Aetna Cas. & Sur. Co. v. Gosdin*, 803 F.2d 1153, 1159 (11th Cir. 1986).

However, after *Schrand*, several of our opinions in civil cases stated the following standard: "Even if a mistake has been made regarding the admission or exclusion of evidence, a new trial will not be granted unless the evidence *would have caused a different outcome at trial*." *Morales v. Am. Honda Motor Co., Inc.*, 151 F.3d 500, 514 (6th Cir. 1998) (emphasis added); *Nida v. Plant Prot. Ass'n Nat.*, 7 F.3d 522, 527 (6th Cir. 1993); *Polk v. Yellow Freight Sys., Inc.*, 876 F.2d 527, 532 (6th Cir. 1989). This version would seem to require an appellant to do more than merely deprive the appellate court of a "fair assurance" that the error was *not* outcome-determinative, as under *Kotteakos*. Instead, he must show by a preponderance of the evidence that the error *was* outcome-determinative.[2]

---

[2] Other formulations that have appeared are more consistent with *Schrand*. *See Horn by Parks v. Madison County Fiscal Ct.*, 22 F.3d 653, 662 (6th Cir. 1994) (trial court's erroneous exclusion of evidence was

*Schrand* is a published opinion adopting the *Kotteakos* "fair assurance" standard of harmless evidentiary error in a civil case. *Schrand*, 851 F.2d at 157; *Taylor*, 193 F.3d at 235 (classifying the Sixth Circuit as following *Kotteakos* in civil cases, citing *Schrand*; embracing the same rule). To the extent the language of our later panel decisions is inconsistent with this holding, we follow *Schrand*. "[A] panel of this [c]ourt cannot overrule the decision of another panel. The prior decision remains controlling authority unless an inconsistent decision of the United States Supreme Court requires modification of the decision or this Court sitting en banc overrules the prior decision." *Darrah v. City of Oak Park,* 255 F.3d 301, 309 (6th Cir. 2001); *accord* 6th Cir. R. 206(c).

Accordingly, we begin by asking whether there was evidentiary error in the trial. If so, then we "examin[e] the proceedings in their entirety," *Kotteakos*, 328 U.S. at 762, in the light of the proofs at trial, to determine whether the errors affected substantial rights. If we do not have a "fair assurance" that the trial's outcome was not altered by error, we must reverse. *Schrand*, 851 F.2d at 157.[3]

---

harmless error when it "worked no substantial prejudice"); *Polk*, 876 F.2d at 532 (declining to reverse when erroneous evidentiary decision "could not have resulted in a different result at trial").

[3] While *Schrand* held that the *Kotteakos* standard applies to civil and criminal cases alike, we do not interpret *Schrand* to say that the prejudice inquiry must ignore differences between the two types of case. In particular, different burdens of persuasion apply in civil and criminal trials. In a criminal case, where proof must be beyond a reasonable doubt, a reviewing court might find itself unable to say, with "fair assurance," *Kotteakos*, 328 U.S. at 765, that a given evidentiary error, or set of errors, was harmless. Reversal would then be required. Yet in an otherwise similar *civil* trial, the same error or errors might *not* be enough to shake the court's fair assurance that the jury still would have found against the appellant in the absence of the error, in light of the lower, preponderance of the evidence, standard of proof. *Cf. Schrand*, 851 F.2d at 157 (instructing courts to pay attention to "the one-sided or closely balanced

## III

A district court's decisions to admit or exclude evidence are reviewed for abuse of discretion. *United States v. Cline*, 362 F.3d 343, 348 (6th Cir. 2004). An abuse of discretion occurs when the district court "relies on clearly erroneous findings of fact, . . . improperly applies the law, . . . or . . . employs an erroneous legal standard." *Ibid.*

Claims of error in jury instructions require the instructions to be reviewed as a whole, in order to determine whether they adequately informed the jury of the relevant considerations and provided a basis in law for aiding the jury in reaching its decision. *O-So Detroit, Inc. v. Home Ins. Co.*, 973 F.2d 498, 502 (6th Cir. 1992); *Blackwell v. Sun Elec. Corp.*, 696 F.2d 1176, 1181 (6th Cir. 1983).

### A

Plaintiffs first contend that the district court erred by excluding the testimony of Mr. Linton. They argue that his evaluation of the county's dive efforts was relevant to the question of whether the defendants provided a "meaningful alternative" to private rescue. They also argue that Linton's experience qualified him to testify about the degree of difficulty the MSRDT divers would likely have faced in recovering Beck, had they dived after him. When reviewing proposed expert testimony, the district court must determine whether the evidence rests upon a reliable foundation and is relevant. Fed. R. Evid. 702; *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 597 (1993). A district court abuses its discretion if it bases "its ruling on an erroneous view of the law or a clearly erroneous assessment of the evidence." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 405 (1990).

nature of the evidence" in deciding whether error was harmless in a given case).

We agree with the plaintiffs that some of Linton's proposed testimony was relevant to the "meaningful alternative" issue, and should have been admitted. To be sure, the district court was right to observe that the question of whether or not "this was a perfect rescue operation" was irrelevant to the case. Our previous opinion in this matter drew upon the analysis in the Seventh Circuit's opinion in *Ross v. United States*, 910 F.2d 1422 (7th Cir. 1990), in describing the constitutional due process claim raised by the Becks' complaint. We adopted *Ross*'s formulation: a municipality cannot "arbitrarily cu[t] off private sources of rescue without providing a meaningful alternative." *Beck*, 2000 WL 1597942 at *4 (quoting *Ross*, 910 F.2d at 1431). The concept of "meaningfulness" at issue here must be understood with reference to the underlying constitutional doctrine of due process, which prohibits only "egregious or arbitrary government conduct," *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 198 (2003), not conduct that is merely ill-reasoned or ill-advised. Thus, a broad range of possible dive rescue techniques might qualify as "meaningful," even if they were not the most effectively adapted for the task.

In this case, however, Linton offered testimony that several aspects of the county's response to the Beck drowning suggested the county was not, in fact, engaged in a rescue operation at all, but only in a body recovery operation. This would obviously fall short of being a meaningful alternative to rescue. There was evidence that the county had specifically decided not to hold itself out as providing water rescue services, because it believed that it could not provide a timely response across the length of Manistee County. Indeed, when Beck's fall occurred, the county divers were unable to enter the water until 58 minutes after Beck's plunge, even though the accident site was only two or three minutes from the sheriff's office. Moreover, some trial testimony suggested that when the county divers did recover Beck, they placed him in a body bag and dragged him out by his feet. Other testimony indicated that the city's rescue vehicle, R5, had been on the scene but had been sent home by Chief

Hornkohl before Beck's body was recovered. Linton would have testified that these facts were inconsistent with an attempt at live rescue. He would also have explained the "golden hour" protocol recognized in the field of water rescue: one hour of submersion is the outer limit of survival for a drowning victim. Furthermore, Linton testified in his deposition that water rescue operations are rarely run out of sheriff's departments, as the Manistee County dive team was; rather, such operations are more commonly run out of local fire departments, which can respond faster.

Such testimony meets the general relevance requirement of Fed. R. Evid. 401 and the expert opinion requirements of Fed. R. Evid. 702. In light of Linton's expertise, his testimony could have been helpful to the jury in deciding whether what occurred was a rescue operation or a recovery operation, and thus whether it was a meaningful alternative to private rescue. *See* Fed. R. Evid. 702 (permitting opinion testimony based on relevant "scientific, technical, or other specialized knowledge" if, *inter alia*, the witness is appropriately "qualified as an expert by knowledge, skill, experience, training, or education"). As a water rescue expert, Linton also could have provided potentially helpful testimony on whether Mosack and Cole would have been likely to encounter difficulty in recovering Beck if they had entered the water on that night.

We agree with the district court, however, that Linton was not sufficiently qualified to opine on whether Beck's life would have been saved if Mosack and Cole had entered the water and searched for him. That was properly a medical judgment, and Linton (unlike plaintiffs' other proffered expert witness, Dr. Steinman) lacked the medical training to qualify him to render such a judgment.

### B

Plaintiffs' second issue concerns the district court's decision to exclude, as irrelevant, Monck's letter to the county

dispatch director, in which he complained that the municipal authorities never notified the Coast Guard of the Beck drowning. We agree that this letter should not have been excluded as irrelevant. The letter is relevant for reasons similar to those that required admission of part of Mr. Linton's testimony, discussed above. Monck stated that the county had not notified the Coast Guard of Beck's accident, even though the Coast Guard boat was on patrol and could have arrived at the scene in about two minutes. If believed by the jury, this evidence would clearly support one of the plaintiffs' main theories of the case: that the county was not interested in providing live rescue at all, only body recovery. Thus, the letter is relevant to the "no meaningful alternative" element of the plaintiffs' case.

The defendants argue that even if the letter is relevant, it still should have been excluded as hearsay. The district court did originally exclude the letter as hearsay, but later reconsidered this part of its ruling *sua sponte* and reversed it.

The parties have not included in the record sufficient documents or transcripts of the proceedings to allow us to revisit the district court's thinking on the hearsay issue, which appears to involve a number of complex considerations. As best we can gather from this vantage point, the plaintiffs attempted to subpoena Chief Monck to testify about the matters addressed in his letter to the county dispatcher. The district court quashed the subpoena. It is unclear whether it did so because the Coast Guard had refused to comply with the subpoena (perhaps pursuant to its authority as a federal agency to "prescribe regulations for . . . the conduct of its employees [and] . . . the custody, use, and preservation of its records, papers, and property," under the so-called "housekeeping statute," 5 U.S.C. § 301), or for another reason. Monck later offered an affidavit that authenticated his letter. The district court then revisited its hearsay ruling, and concluded that the Coast Guard's response rendered Monck an "unavailable" witness within the meaning of Fed. R. Evid. 804, and apparently concluded that Monck's testimony also

satisfied an appropriate hearsay exception – perhaps the "catch-all" exception of Fed. R. Evid. 807.[4]

In the end, the district court explicitly rested its ruling on lack of relevance, not on hearsay. The parties have not provided a sufficient appellate record for us to decide whether the hearsay issue provides an alternative basis for affirming the district court's ruling. We accordingly express no opinion on this question. The district court may choose to revisit the point on remand.

C

The plaintiffs also challenge the district court's decision to exclude two letters written to Tom Kaminski, the Manistee County Administrator, by William Page, a risk consultant with the Michigan Municipal Management Authority (a public-entity liability and property insurer). On Februrary 8, 1993, Page wrote a note on the cover page of a fax to Kaminski, stating that "[l]egislation indicates sheriff / police chiefs have duty to establish "recovery" capacity . . . but may also call upon other agencies to aid in recovery of a body." Page added: "Rescue operations signify an even higher

---

[4]It is an interesting question whether such a refusal by the Coast Guard (if that is what happened) would, in fact, render a witness "unavailable" for purposes of Fed. R. Evid. 804 and/or 807, thereby making his earlier hearsay statements potentially admissible. The agency's say-so does not conclude the matter of whether the witness is unavailable. Rather, our court has held that the "housekeeping" statute for military and other federal agencies, 5 U.S.C. § 301, does not empower agencies "to prescribe regulations that direct a party to deliberately disobey a court order, subpoena, or other judicial mechanism requiring the production of information." *In re Bankers Trust Co.*, 61 F.3d 465, 470 (6th Cir. 1995); *accord Exxon Shipping Co. v. United States Dep't of Interior,* 34 F.3d 774, 777 (9th Cir.1994), although we have also held that an agency employee cannot be held in contempt for relying on such a regulation, *Appeal of S.E.C.*, 226 F.2d 501, 516 (6th Cir. 1955).

We express no opinion on this question, which is not properly before us.

standard of care, training, equipment, etc. As I read the statute the[re] is no duty to provide a rescue team!" The note closed by stating that "the liability would significantly increase" if the county created a rescue team.

On March 25, 1993, after a drowning accident in the Manistee River, Page sent a typed letter to Kaminski "reinforc[ing] our risk control opinion that Manistee County should not expand its present services in the Sheriff's Department in the area of water recovery." Page referred in this letter to a "position taken and expressed . . . by Sheriff Haik" that the county should decline to provide official rescue services, and Page endorsed this position. Echoing his previous note, Page added: "Any agreement to provide underwater rescue service would generate considerable expenditures in staffing, trainin[g], and equipment while at the same time greatly increasing exposure to liability."

Plaintiffs proffered these two letters as admissions of an opposing party, admissible under the hearsay exception of Fed. R. Evid. 801(d)(2)(D). They offered to redact the letters to exclude the closing references to liability, in conformity with Fed. R. Evid. 411. The district court held the letters inadmissible on the grounds that they were irrelevant and excessively prejudicial. It reasoned that the letters could not be redacted to remove the references to liability without rendering them misleadingly incomplete. On appeal, the defendants argue that the district court's ruling was correct, and renew their argument, presented below, that the letters were also subject to exclusion as hearsay.

We are compelled to conclude that the letters should have been admitted. They were relevant. They dealt with whether the county had decided to forego live rescue attempts in water accidents. If the jury believed it had done so, this would be highly relevant, if not decisive, as to the question of whether the defendants failed to provide a meaningful alternative to private rescue. As to prejudice, the thrust of the letters was to advise the county not to adopt water rescue, and to report

that Sheriff Haik had taken such a position. The letters could easily have been redacted by removing the sentences referring to liability without distortion of their meaning.

Defendants' argument that the letters were improper hearsay also requires consideration. Fed. R. Evid. 801(d)(2) provides that statements are not hearsay if they are "offered against a party and [are made] . . . by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship." The chief issue is the nature of Page's relationship with the county. Defendants state that Page was simply a consultant, providing risk assessment services as part of the county's agreement with the Michigan Municipal Management Authority. Assuming this is so, we hold that Page's statements in the letters still count as "admissions" under Rule 801(d)(2)(D). The statements dealt directly with the subject matter of the Management Authority's contract with the county, and were expressed during the course of that relationship. Though there is little precedent on the matter, courts confronting similar factual situations have tended to hold contractors and advisors to fall within the "agency" relationship contemplated by Rule 801(d)(2)(D).[5] Our court reached a similar conclusion in a criminal case, *United States v. Branham*, 97 F.3d 835, 851 (6th Cir. 1996), in which we held that a paid civilian informant was the government's "agent" under Rule 801(d)(2)(D) with respect to statements he made in order to establish a relationship with the defendant. *See also United States v. Wiedyk*, 71 F.3d 602,

---

[5] *See EEOC v. Watergate at Landmark Condo.*, 24 F.3d 635, 640 (4th Cir. 1994) (holding that statements of condominium residents on advisory committees were admissible under Rule 801(d)(2)(D) in a former employee's discrimination action against the condominium association); *United States ex rel. Remtech, Inc. v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa.*, Nos. 99-35038, 99-35297, 2000 WL 1171139, *3 n.4 (9th Cir. 2000) (unpublished opinion) (holding a consultant's statement about his desire to help his client avoid a contract to be admissible against the client under Rule 801(d)(2)(D)).

605-06 (6th Cir. 1995) (assuming *arguendo* that an employee of a professional services company hired by a union fund was the fund's "agent" under Rule 801(d)(2)(D) with respect to his assertions dealing with his company's work for the fund).

Defendants argue next that the letters would have been merely cumulative. They point out that the County's former deputy sheriff, Kowalkowski, admitted under cross-examination by plaintiffs' counsel that, prior to Beck's drowning, the county had decided not to hold itself out as offering rescue services. However, the letters would have provided additional perspective on the county's actions. The thrust of Kowalkowski's testimony was that the county chose not to offer rescue services "[i]n name." The letters went further, suggesting that the county did not merely decline to offer rescue services by name, but that it affirmatively decided, on financial grounds, to offer only body recovery services. Thus, while the defendants are correct that Kowalkowski's testimony tended to mitigate the effect of erroneously excluding the letters, it did not render the letters merely cumulative.

D

Plaintiffs presented testimony at trial from Cheryl Debano-Griffin, the Manistee County dispatch director. At one point, plaintiffs' counsel made an offer of proof, and asked Debano-Griffin questions aimed at developing a foundation for the argument that the county had deliberately destroyed the dispatcher's audio tape of the events of June 28, 1995. Debano-Griffin confirmed that the tape was demagnetized by the dispatcher's office, and thus was unavailable. (Plaintiffs did introduce into evidence the printed dispatch log. However, this was less complete, and the time stamps on the printed log were not always contemporaneous with events.) She testified that it was the routine practice of the office to maintain tapes for thirty days, and then, if no one requested preservation of the tape or a copy, to demagnetize and reuse them. She further testified that the Coast Guard verbally

requested the tape from her office during that 30-day period, and that she reviewed the tape with Chief Monck and other Coast Guard personnel. In addition, an attorney (not a participant in the present litigation) filed a written Freedom of Information Act requesting the tape from the night of Beck's death. This FOIA request was filed one or two days before the expiration of the 30-day period, but it was filed with the Manistee County Sheriff's Department, rather than the dispatcher's office. Debano-Griffin testified that her office did not receive the written FOIA request until shortly after the expiration of 30 days, and that by then the tape had been demagnetized. Plaintiffs argued that the Coast Guard's verbal request, and the sheriff's failure to convey the written request to the dispatch office, raised an inference of spoliation of evidence by the County. The district court did not agree. It reasoned that the written request was filed only one or two days before the expiration of the 30-day deadline, and was filed with the sheriff's office rather than the county dispatch office. Thus, it concluded, the logical inference was that an innocent bureaucratic error had prevented the request from being received in time to prevent the destruction of the tape.

We review the district court's decision to exclude evidence of spoliation for abuse of discretion. *United States v. Copeland*, 321 F.3d 582, 597 (6th Cir. 2003). The district court's reasoning here would have been within its discretion if the failure to respond to the written request were the only evidence of a possible spoliation. However, it was not. Debano-Griffin also testified that the dispatch office received a direct verbal request from the Coast Guard for a copy of the tape. While the plaintiffs, during their brief offer of proof, did not establish the date of the receipt of this verbal request, it must have preceded the written FOIA request, because it occurred in time for the tape to be produced intact to the Coast Guard. Debano-Griffin also testified that receipt of a verbal request was enough to justify preserving a tape. That being so, it would appear that the tape should have been preserved after the regular 30-day deadline expired, regardless of whether the written FOIA request had been received by

that date. Yet it was not. The fact that Monck's letter to the county dispatcher was marked with the written annotation, "cut tape," could also be viewed as supporting the plaintiffs' arguments.

Spoliation is the intentional destruction of evidence that is presumed to be unfavorable to the party responsible for the destruction. *Ibid.* The rules that apply to the spoiling of evidence and the range of appropriate sanctions are defined by state law; in this case, the law of Michigan. *Nationwide Mut. Fire Ins. Co. v. Ford Motor Co.*, 174 F.3d 801, 804 (6th Cir. 1999). Michigan treats evidence of spoliation as relevant to trial proceedings in a number of respects. "A trial court has the authority . . . to sanction a party for failing to preserve evidence that it knows or should know is relevant before litigation is commenced." *Bloemendaal v. Town & Country Sports Ctr. Inc.*, 659 N.W.2d 684, 686 (Mich. Ct. App. 2003). A party may also be entitled to special instructions if he can raise an issue of fact as to whether a party has failed to preserve relevant evidence. *See Brenner v. Kolk*, 573 N.W.2d 65 (Mich. Ct. App. 1998); Mich. Std. Jury Instruction 2d 6.01. In the posture in which this appeal reaches us, we need not consider whether any of these measures could be appropriate in this case. It is enough to say that there was sufficient evidence to entitle the plaintiffs to present their spoliation evidence to the jury.

E

Plaintiffs argue next that the court committed reversible error when it allowed the defendants to elicit testimony that Eugene Beck had a criminal record and that his parents had been accused of child molestation. They argue that this questioning was irrelevant and highly prejudicial. Defendants argue that it was proper cross-examination, because plaintiffs had opened the door to it.

Sharon Beck, Eugene's mother, testified on direct examination that she had sought counseling for her grief and

anger after the death of her son. The plaintiffs had previously secured a ruling from the district court that forbade defendants from introducing any evidence of Eugene's criminal record, unless Mrs. Beck's testimony opened the door to it as rebuttal. In cross-examining Mrs. Beck about her relationship with her son, defense counsel asked Mrs. Beck if Eugene was "difficult" and "got into trouble." She replied that if so, "he didn't go out and cause it" and added that "he wasn't convicted on none of them." Defense counsel then asked Mrs. Beck directly whether her son had gone to prison, and she admitted he had. Plaintiffs' counsel's contemporaneous objection was overruled.

We do not believe this was error. The district court acted within its discretion by implicitly ruling that Mrs. Beck's remark that Eugene "wasn't convicted" opened the door to counsel's question. "When a party opens up a subject . . . the party cannot complain on appeal if the opposing party introduces evidence on the same subject." *United States v. Bender*, 265 F.3d 464, 471 (6th Cir. 2001) (quoting *United States v. Ramos,* 861 F.2d 461, 468-69 (6th Cir.1988)) (holding that defense counsel was permitted to cross-examine defendant about her prior drug conviction, notwithstanding district court's earlier order excluding such testimony, when defendant testified on direct examination that she had never sold drugs).

However, we cannot say the same of the other line of questioning challenged by plaintiffs. In the course of questioning Mrs. Beck about her need for counseling, defense counsel asked whether she had "other upsetting events" in her life besides Eugene's death. Mrs. Beck replied: "Like what?" Defense counsel then asked: "Well, on several occasions you and your family were accused of child molestation?" Plaintiffs' counsel objected strenuously, but was overruled. Plaintiffs' counsel then moved for a mistrial, which was denied. It emerged that the accusation had originated with the adoptive parents of Mrs. Beck's granddaughters. An investigation was dropped after Mrs. Beck passed a lie

detector test. It was unclear whether any charges were ever filed.

This questioning was both irrelevant and unduly prejudicial, and should have been disallowed. It certainly did not satisfy the requirements of Fed. R. Evid. 608, which permits the use of past crimes for impeachment, but only where, among other requirements, the evidence indicates "that a witness . . . has been *convicted* of a crime." We have cautioned that introducing unrelated evidence of sexual crimes or deviancy risks "cater[ing] to the passions of the jury" and "prejudic[ing] [a party's] chance for a fair trial." *United States v. McFadyen-Snider*, 552 F.2d 1178, 1182 (6th Cir. 1977). Here, plaintiffs' choice to present Mrs. Beck's testimony about her love of her son and her need for grief counseling could fairly be seen as opening the door to questions about the stormy aspects of her relationship with her family. But counsel's question about apparently uncharged, and certainly unproven, accusations of child molestation by others against Mrs. Beck simply was not relevant to that subject. The record does not even indicate that defense counsel had any reason to believe the charges were meritorious. Therefore, Mrs. Beck's request for clarification of counsel's previous question about "upsetting events" requiring counseling could not have "opened the door" to any follow-up question about the accusations of molestation.

The district court's denial of a motion for mistrial is reviewed for an abuse of discretion. *United States v. Green*, 305 F.3d 422, 428 (6th Cir. 2002). In appeals of civil cases, grants of mistrial on the basis of a single episode of improper questioning or argument have been rare. *See, e.g.*, *Vineyard v. Murray County, Ga.*, 990 F.2d 1207 (11th Cir. 1993) (affirming the district court's decision to deny motion for mistrial in excessive force case under § 1983 when plaintiff's counsel urged jury in closing argument to "send a message" in light of recent Rodney King riots; district court gave curative instruction). One court has held that, where an

appellant challenges a denial of mistrial on the basis of evidence that the trial court held admissible, the appellant faces an "unusually heavy appellate burden" of demonstrating that the denial of mistrial was an abuse of discretion, on top of demonstrating that the admission of the evidence was an abuse of discretion. *Tamko Roofing Prod., Inc. v. Ideal Roofing Co., Ltd.*, 282 F.3d 23, 39 (1st Cir. 2002).

For reasons we discuss in Part IV, *infra* at pp. 30-32, we need not consider whether the improper questioning of Mrs. Beck was sufficiently prejudicial by itself to merit a mistrial. It is enough that the error was significant and, in conjunction with the other evidentiary errors we have identified, deprived the Becks of a fair trial.

### F

The plaintiffs offer one other argument meriting discussion. It concerns the instructions given as to the first element of their case. The district court instructed the jury that the plaintiffs had to show that the defendants imposed a policy "preventing" private rescue efforts. The plaintiffs argue that this was an inappropriate gloss on the language of this court's previous opinion, thereby improperly increasing the plaintiffs' burden. The plaintiffs urge that the instruction should have stated that defendants' policies must "hinder" or "deter" private rescue. They note accurately that this court used these words in some passages of its earlier opinion.

We conclude that the district court's instructions adequately informed the jury about the law and the relevant considerations. As defendants point out, the district court's instructions were also grounded in our prior opinion, which used the word "prevent" to describe the elements of the plaintiff's claim: "*Ross* holds that official action *preventing* rescue attempts by a volunteer civilian diver can be arbitrary in a constitutional sense if a state-sponsored alternative is not available when it counts – and we are constrained to agree." *Beck*, 2000 WL 1597942 at *4 (emphasis added); *see also*

*Ross*, 910 F.2d at 1431 (holding that plaintiff stated a constitutional claim when he alleged that the county "had a policy of arbitrarily cutting off private sources of rescue without providing a meaningful alternative"). It is not reversible error when a court refuses to use the exact language counsel requests in a jury instruction. *Blackwell*, 696 F.2d at 1183; *Thompson v. Underwood*, 407 F.2d 994, 997 (6th Cir. 1969). There is, in any event, great semantic overlap among the terms "prevent," "hinder," and "deter." *Compare* The American Heritage Dictionary of the English Language 1391 (4th ed. 2000) (noting that "prevent" and related verbs "mean to stop or hinder . . ., especially by advance planning or action") *with id.* at 494 (defining "deter" as "[t]o prevent or discourage from acting") *and id.* at 830 (noting that "hinder" means "to hold back and often implies stopping or prevention"). The instructions were proper.

The plaintiffs have offered other assignments of error, which we have considered. Because we find them to be clearly without merit, we see no need to discuss these additional arguments.

### IV

The last issue is whether the errors in the trial require reversal. Examining the proceedings in their entirety, we believe that the substantive issues were significantly contested. The Becks argued forcefully that the County and City arbitrarily prevented private rescue as a matter of policy. They presented testimony from MSRDT members Hornkohl and Krause that they had been threatened with arrest were they to enter the water at an accident scene. Several other local witnesses testified that they had seen or heard of a memo from the sheriff declaring water accidents to be crime scenes, and some testified that they had heard of an arrest policy connected with that memo. The individual defendants, in turn, squarely denied adopting such a policy or threatening the MSRDT members. The defendants presented testimony from the local fire chiefs that tended to support their position.

Likewise, the plaintiffs offered pertinent evidence that, despite some of the trappings of rescue, the county really offered only body recovery services, and thus offered no meaningful alternative to private rescue. Cole, a trained diver, and Dr. Steinman, plaintiffs' expert witness, testified that several aspects of the county dive team's response, such as the use of the body bag, and failure to enter the water for 58 minutes, suggested that they were not serious about rescue. But this aspect of the plaintiffs' case would have been bolstered significantly if the testimony of Linton, the dive expert, and the letter from Coast Guard officer Monck had been admitted.

Causation was perhaps the weakest element of plaintiffs' case. However, they presented Dr. Steinman's expert testimony that Beck probably could have survived if rescued within 20 to 30 minutes of submerging. If the jury believed the testimony of Mosack, it easily could have concluded that the MSRDT divers could have recovered Beck during this time. Defendants' medical expert, Dr. Dueker, testified that it was unlikely that Beck would have survived even 10 to 15 minutes' submersion, thus casting doubt on plaintiffs' claims of causation. He also offered plausible criticisms of the research that underpinned Dr. Steinman's opinion. We think it is relevant, though, that during its deliberations, the jury asked a question about the meaning of the term "arbitrarily" in the jury instructions. This was not part of the definition of the causation element of plaintiffs' case. The question suggests that the jury may have thought plaintiffs had presented enough evidence of causation to justify careful attention to whether they had proved the other elements of their case.

We have identified five errors that inured to the detriment of the Becks: (1) the exclusion of Linton's expert testimony; (2) the exclusion of the Coast Guard letter; (3) the exclusion of the letters from the county risk consultant, Mr. Page; (4) the exclusion of the spoliation evidence; and (5) the improper questioning of Mrs. Beck on accusations of child

molestation. In our view, errors (2) and (4) involved affirmative evidence with a significant potential to persuade the jury, and error (5) raised a significant possibility of improper prejudice.

Should these effects be weighed together? Our court has adopted the doctrine of "cumulative error" in criminal cases: we consider the "combined effect" of multiple trial errors to determine whether they are unfairly prejudicial. *United States v. Parker*, 997 F.2d 219, 222 (6th Cir. 1993). We have not yet had occasion to decide whether the same rule applies in civil cases. However, most of our sister circuits follow the cumulative-error doctrine in both civil and criminal cases. *See, e.g., Frymire-Brinati v. KPMG Peat Marwick*, 2 F.3d 183, 188 (7th Cir. 1993); *Malek v. Fed. Ins. Co.*, 994 F.2d 49, 55 (2d Cir. 1993); *Hendler v. United States*, 952 F.2d 1364, 1383 (Fed. Cir. 1991); *United States v. Rivera*, 900 F.2d 1462, 1469 (10th Cir. 1990); *but see SEC v. Infinity Group Co.*, 212 F.3d 180, 196 (3d Cir. 2000).

We agree with the majority of courts that the cumulative-error doctrine should extend to civil cases. The "substantial right" standard that governs harmless error analysis is defined in terms of whether errors may have influenced the jury's verdict. *Schrand*, 851 F.2d at 157; *see generally* Part II, *supra* at pp. 13-16. Since a jury reaches its verdict in light of the evidence as a whole, it makes no sense to try to analyze errors in artificial isolation, when deciding whether they were harmless.

Applying this standard, we conclude that we lack a "fair assurance" that the verdict below was not substantially swayed by error. *Schrand, ibid.*; *Kotteakos*, 328 U.S. at 765. The trial was contested enough that fairness requires a new trial in which the Becks may present the range of relevant evidence denied to them below.

**V**

For the foregoing reasons, the judgment is REVERSED and the case is REMANDED for a new trial.