*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206

File Name: 06a0384p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

ANTHONY APANOVITCH,

        *Petitioner-Appellant,*

    *v.*

MARC C. HOUK, Warden,

        *Respondent-Appellee.*

> No. 94-3117

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 91-02221—John M. Manos, District Judge.

Argued: March 7, 2006

Decided and Filed: October 19, 2006

Before: BOGGS, Chief Judge; and DAUGHTREY and MOORE, Circuit Judges.

---

**COUNSEL**

**ARGUED:** Dale A. Baich, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE DISTRICT OF ARIZONA, Phoenix, Arizona, for Appellant. Michael L. Collyer, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for Appellee. **ON BRIEF:** Dale A. Baich, Jon M. Sands, OFFICE OF THE FEDERAL PUBLIC DEFENDER FOR THE DISTRICT OF ARIZONA, Phoenix, Arizona, Mark R. DeVan, BERKMAN, GORDON, MURRAY & DeVAN, Cleveland, Ohio, for Appellant. Michael L. Collyer, OFFICE OF THE ATTORNEY GENERAL, Cleveland, Ohio, for Appellee.

---

**OPINION**

---

     BOGGS, Chief Judge. Mary Anne Flynn was found murdered and raped in her Cleveland home in August 1984. Four months later, a Cleveland jury convicted Anthony Apanovitch for aggravated murder, aggravated burglary, and two counts of rape, and the Cuyahoga County Court of Common Pleas sentenced him to death and to 45-75 years of imprisonment. Following a tortured procedural history involving parallel state and federal criminal appeals, and collateral civil litigation, Apanovitch now appeals from the district court's 1994 denial of his 1991 habeas petition, asking us to reverse the district court's denial of the writ or, at a minimum, to order the district court to conduct an evidentiary hearing. Specifically, the petitioner raises four basic claims on appeal: (1) that the state improperly failed to provide him with favorable exculpatory and impeachment evidence in violation of *Brady v. Maryland*, 373 U.S. 83 (1963), and that these purported violations

prevented him from presenting certain claims in his habeas petition filed in the district court pursuant to 28 U.S.C. § 2254; (2) that the state trial court improperly admitted the testimony of a prisoner who made one out-of-court statement to the prosecution but recanted that statement during *voir dire*; (3) that the trial court improperly admitted inflammatory and prejudicial hearsay by allowing certain witnesses to testify as to the victim's alleged fears of the defendant; and (4) that insufficient evidence exists to support his conviction. On cross-appeal, the State of Ohio requests that, should we remand the case, we grant an evidentiary hearing so that the district court could authorize a DNA test comparing swabs of bodily fluids that had been collected from the victim's body at the time of the murder investigation (which had allegedly been lost and later rediscovered in mid-1992) to the petitioner's own DNA. In light of the state's apparent failure to provide potentially exculpatory materials to Apanovitch prior to the filing of his petition, and of the untested nature of the DNA evidence, we reverse and remand the matter, noting that the district court retains the authority to conduct an evidentiary hearing should it deem it appropriate to do so. However, we affirm the district court's order with respect to the remaining issues raised on appeal, including the *Brady* claims that we do not find to be meritorious, the petitioner's challenges as to the admission of certain witnesses, and the insufficiency of evidence claim.

## I

### A

Mary Anne Flynn, a young nurse and midwife, was employed at Cleveland Metropolitan General Hospital. On August 23, 1984, Flynn visited her brother Martin, leaving to return home at about 9:30 p.m. At approximately 10 p.m. on the evening of her death, one of Flynn's neighbors heard her get out of her car and walk to the back door of the duplex she owned. Other neighbors heard her front door bang shut around that time. Around midnight, other neighbors heard a loud bang or thud from inside her house.

The following day, Christine Schenk, Flynn's co-worker and friend, became concerned when Flynn did not report to work. After unsuccessfully trying to contact her, Schenk called Flynn's brother, and together they gained access to Flynn's apartment through the tenants' side of the basement of the duplex Flynn owned. They found the front door locked and chained from the inside, but a window in the basement appeared to have been forcibly opened, and one of the window sills was missing. In the second-floor bedroom, they discovered Flynn's naked and battered corpse lying face-down on her mattress with her hands tied behind her back, with one end of what appeared to be a rolled-up bedsheet tied around her neck and the other end tied to the headboard.

The cause of death was found to be asphyxia by cervical compression; in lay terms, she was strangled to death. Spermatozoa and other bodily fluids were found in her mouth and vagina. There were wood chips and slivers from the basement window sill in the bedroom and on her body, and a laceration on the back of her neck contained slivers of wood from the same window sill. The coroner later concluded she had died sometime between midnight and 6 a.m.

But police found little physical evidence of the perpetrator. They found no bodily material under Flynn's fingernails. The coroner discovered a small number of hairs, but only one of them was inconsistent with the victim's hair. The only blood at the scene belonged to Flynn, and was on the bed and the corpse. The dusty basement floor did not reveal any footprints. The police identified a number of latent fingerprints, but none of them belonged to Anthony Apanovitch, the man who became the department's chief suspect. In fact, the only pieces of physical evidence from the crime scene that were even potentially linked to the perpetrator were the bodily fluids found in Flynn's corpse, which had been emitted from a person who secretes blood type A. The police discovered that Apanovitch secretes blood type A; they also discovered, but did not reveal, that the victim also secreted blood type A.

**B**

The day after discovering Flynn's corpse, police found her checkbook on the kitchen table, and, *inter alia*, it contained a receipt for house painting made out to Anthony Apanovitch. The checkbook also contained two cancelled checks indicating that Flynn had paid Apanovitch for house painting in the past. During their investigation, police heard from several neighbors and friends that Flynn had expressed to them her fear of a "painter" in the weeks and months preceding her murder. Some of Flynn's friends stated that she had told them that her fear of the "painter" had grown so severe that she had hired a realtor to begin searching for a new home elsewhere in Cleveland; in fact, one witness later testified that Flynn had told her about her plans to move at lunch on the day of her murder. Police soon came to suspect Apanovitch.

Police also learned that Apanovitch had been painting houses across the street from Flynn's home in addition to the work he had performed on her house, and that he had made numerous unrequited romantic advances toward her. Apanovitch's co-worker Dawson Goetchius supposedly told police that Apanovitch had told him that Flynn was a "real fox" and that he would "like to get in her pants," though, during trial, Goetchius denied having said anything of the sort. Rather, Goetchius testified that Apanovitch had approached Flynn in her driveway on the afternoon before her murder to discuss painting Flynn's basement window sills, but his words relating Apanovitch's romantic interest in the victim were revealed to the jury. Meanwhile, police came to believe that the unusual layout of Flynn's duplex required prior familiarity with the house in order to break into her part of the duplex through the basement, a knowledge that Apanovitch undoubtedly possessed.

Four days after discovering Flynn's corpse, detectives arrested Apanovitch. He did not attempt to flee and, once in custody, he waived his *Miranda* rights. He admitted that he knew the victim, that he had done some painting at her home, and that he had spoken with her on the afternoon before she was murdered. Apanovitch had what seemed to be a new scratch on his face, and he stated that he had received it on the night of August 23. But his attempted explanations varied over time. While all of his accounts involved a man outside the Comet Bar who had experienced car trouble, he variously told investigators that (1) he had been involved in a knife fight, but was cut by flying glass, (2) a bottle fell and broke, and that the glass had scratched his face, (3) the hood of the unknown man's car had scratched his face, (4) he had been scratched by backlash from the bottle, and (5) he had been in a fight. A physician working for the prosecution examined the scratch and later testified that it was consistent with injuries caused by broken glass drawn over the skin, by the tip of a knife, or, allegedly more likely, by fingernails.

Police demanded an alibi. Apanovitch responded that he was unable to recall precisely when and how long he had spent in each of the several drinking establishments that he had patronized that evening. Moreover, he was unable to account for his entire evening: witnesses did not confirm his presence at any of the bars for the period running from around 9:15-10:00 p.m. until 12:45 a.m. that night. Later, at trial, one witness recalled that he had seen Apanovitch at one bar (within walking distance of Flynn's home) around 11-11:15 p.m., but he had failed to mention this to police investigators. Worse, from the investigators' perspective, Apanovitch approached waiters at the bars after his release from jail and asked them to recall his presence in their bars that night at particular times.

When asked to provide hair and blood samples, he voluntarily provided them. Police released Apanovitch from jail two days afterwards. Two weeks later, police asked him to return so that medical personnel could examine his penis for bite marks; he complied, and no marks were found. The police could not find any physical evidence that directly linked Apanovitch to the crime scene, and they found neither blood nor any of the victim's hair on his clothes. In fact, the police department's only physical evidence that even remotely linked Apanovitch to the crime scene was

the fact that he was a secretor of blood type A, consistent with the blood type found in the oral and vaginal swabs of Flynn's body.

The grand jury indicted Apanovitch on October 2 for aggravated murder with felony murder specifications of burglary and rape. During pre-trial proceedings, Apanovitch's counsel filed the usual bevy of discovery demands. In response, the state noted that Apanovitch had made an (undisclosed) oral statement, provided a list of witnesses, and promised to disclose all potentially exculpatory evidence to Apanovitch before trial. As Apanovitch later learned, the state failed to abide by this duty.

Trial commenced on November 28, 1984. The prosecution did not introduce any direct inculpatory evidence at trial, relying instead on circumstantial evidence. Specifically, the prosecution called several witnesses whose testimony is pertinent to our inquiry. First, the state called Dr. Balraj, the physician who had conducted Flynn's autopsy and had examined Apanovitch's facial scratch while he was in custody. Balraj testified that she had found sperm in the victim's mouth and vagina, that there was no bodily tissue under the victim's fingernails, and that the time of death was between midnight and 6 a.m. Dr. Balraj testified further that the scratch on Apanovitch's face was consistent with a cut by glass, fingernails, or a knife, and so she neither confirmed nor denied Apanovitch's attempted explanation for that scratch.

Second, the state called Barbara Campbell, a trace evidence technician with the coroner's office, who testified, in relevant part, that she had found an unidentified hair "on the back portion of the [victim's] hand" (although she testified at the mitigation hearing that she had found the hair on "the victim's right hand, the palm or surface [sic], which would have been facing up"), and that the hair was inconsistent with both the victim's and Apanovitch's hair. Campbell also testified that she had "found no physical evidence that would link [Apanovitch] with the death," but that she did discover that whoever emitted the body fluids found in the swabs of the victim's mouth and vagina was a blood type A secretor. She further noted that Apanovitch himself was a blood type A secretor. She then testified that approximately 44-45% of the population had blood type A, and that 80% of all people secrete their blood type, so there were roughly 340,000 men in Cuyahoga County alone who could have emitted the fluids found on the swabs.[1]

Five police detectives testified as to their investigation. Most importantly, Detective Anthony Zalar testified that Apanovitch had called him to "ask[] me *when* he's indicated [sic] would I please contact him first rather than just go arrest him. I guess his mother has a heart problem so that he could inform his mother first so she would know before he's arrested." (emphasis added). Defense counsel objected because the prosecution had not previously disclosed this statement. The prosecution responded that this had only been an oral statement, and so there was no written record of the conversation that they could have disclosed to the defense. Accepting that answer, the trial judge overruled the objection. On cross-examination, Detective Zalar said that he had been "stunned" when Apanovitch had used the words "when I am indicted," but he did not recall noting that statement in his report. Defense counsel then asked to review the detective's written report, but the court instead instructed Zalar to review his report and confirm the truth of his statement. In response, the prosecution stipulated to the court that the statement was not in the report. The trial court, having been beguiled by the prosecution, rescinded its order, and so Zalar was not required to review his report or make any disclosure of his records to the defense. As will be discussed below, this prevented Apanovitch from discovering for more than eight years the discrepancies between the written report (which, contrary to the prosecution's stipulation, included a summary of the conversation at issue) and Zalar's trial testimony.

---

[1]The figure "340,000" would seem to have been calculated as the product of 0.8 (the fraction of people who secrete their blood type), 0.44 or 0.45 (the rough proportion of men who have blood type A), and the approximate total male population of Cuyahoga County at that time.

Finally, five of Flynn's friends testified regarding her fear of a "painter." Some of Flynn's neighbors testified as to the noises they claimed to have heard from inside her house on the night of the murder. Apanovitch's co-worker then testified as to Apanovitch's sexual interest in Flynn. Various waiters also testified as to their recollection of Apanovitch's presence in their bars that night.

On December 11, the prosecution rested its case. Before Apanovitch began his defense, the state filed a motion to reopen its case-in-chief based upon "newly discovered evidence." Howard Hammon, a defendant in an unrelated criminal matter, was housed in the same jail cell as Apanovitch. After his attorney had informed him that the prosecution was interested in learning whether anyone had heard Apanovitch make any statements regarding his case while in custody, Hammon told his attorney, and later several attorneys working for the prosecution, that he had heard Apanovitch say "I might have done it but they'll never prove it." During *voir dire*, and under oath, however, Hammon recanted this statement, testifying that

> I was over a mental strain. I lost my mother a few weeks ago. I am back for parole violation, probably more charges and just got done listening to a bunch of tapes and I was drained. They came to me in the courtroom . . . and they hit me at the wrong time and I said something that wasn't true.

The prosecutor read Hammon his earlier statement, and Hammon admitted having made that statement, but then said "he [Apanovitch] didn't say that." Hammon explained that he had recanted his story after speaking with Apanovitch's lawyers, but he also testified that Apanovitch's attorneys did not ask him to change his testimony or to refuse to testify. The court initially held that it would have been prejudicial to allow Hammon to testify, and so it denied the prosecution's motion.

After the defense rested its case, however, the court called Hammon as a court witness. As the judge explained:

> Let them [the jury] see the witness and let them judge whether he is telling the story before, telling five lawyers the same story, did he lie all five times, did he lie once. . . . I think that's all things that the jury must consider and determine. . . . in the interest of justice in this case, particularly, I think the jury should be given all relevant and competent evidence.

Therefore Hammon testified that he had told the prosecutors out of court that he had heard Apanovitch say "I might have done it, but they'll never prove it. All they got is circumstantial evidence." However, Hammon also testified that he had lied in making that statement.

After the prosecution rested its case, Apanovitch filed a Rule 29 motion for acquittal, which the court declined. After Apanovitch's counsel rested its case, the prosecution made its closing argument, which we summarize below:

> (1) that Apanovitch is a blood type A secretor, that 80% of the population are secretors, that one out of three men are blood type A positive secretors, and that the "individual who in fact raped here [sic] or the semen that was found inside of her body in different cavities was a type A – what's the word, secreter [sic]";

> (2) that the jury should disregard the unidentified hair because "It could have been found [sic] in transport . . . . It could have been consistent with 14 or 15 other people";

(3) that Apanovitch had told the police to "call me *when* I am indicted" (emphasis added) before he was in jail, a statement that, as the prosecution emphasized, had "stunned" Detective Zalar;

(4) that people at the bars did not corroborate Apanovitch's alibi, and that Apanovitch himself had returned to the bars after his release from jail to ask the waiters to remember that he was in particular bars between 9 and 10 p.m.;

(5) that Flynn's friends said that she had told them that she was afraid of Apanovitch;

and (6) that Apanovitch had told the police that he had spoken with Flynn about painting her basement window sills, the very windows where the perpetrator probably entered or exited Flynn's house, and the very same object (a basement window sill) that was used to bludgeon Flynn.

The jury found Apanovitch guilty on all counts on December 14, 1984.

At the mitigation hearing, the prosecution argued, *inter alia*, that even though one could "fill Cleveland Stadium with the men in this town that were Type A, secreters [sic]," nevertheless, "if he would have been a Type B, secreter [sic], he wouldn't be in this courtroom." The prosecution also noted at this hearing, referring to Detective Zalar's trial testimony regarding an allegedly unrecorded conversation with the petitioner, that Apanovitch had asked "when" he would be indicted, a fact that had "stunned" the detective. On January 8, 1985, Apanovitch was sentenced to death for aggravated murder, and to 45-75 years imprisonment for the remainder of the counts.

## C

Following Apanovitch's conviction, the procedural history of this case grew progressively more convoluted. Apanovitch filed a timely direct appeal to the state's Eighth District Court of Appeals, and that court affirmed his conviction on August 26, 1986. *State v. Apanovitch*, No. 49772, 1986 Ohio App. LEXIS 8046 (Ohio Ct. App. Aug. 26, 1986). Apanovitch then appealed to the Ohio Supreme Court. In a 4-3 decision, that court affirmed his conviction on October 7, 1987. *State v. Apanovitch*, 514 N.E.2d 394 (Ohio 1987). In an opinion that proved to be strikingly prescient, Justice Herbert Brown, writing a partial dissent in which two other justices joined, speculated that the fact that the victim had blood type A, in tandem with the fact that the report had been silent as to the victim's secretor status, made it statistically *probable* that the victim had been, like 80% of all people of all blood types, a secretor who happened to have the same blood type as the defendant. "If the victim was a secretor, the recovery of a type A antigen from the swab obtained from the victim (who was herself a type A) offers no information concerning the blood type of the assailant, because the recovered antigens could have as easily originated from the victim as from the assailant." *Id.* at 405 (Brown, J., dissenting in part) (emphasis omitted).[2] Justice Brown thus raised the spectre that the serological report's *silence* as to whether Flynn had been a blood type secretor may have rendered the serological evidence introduced at trial even less informative than it seemed at trial.

Presumably in response to Justice Brown's dissent, Barbara Campbell – the technician who had testified at trial about the serological evidence – apparently took it upon herself in March 1988 to amend her report of the Flynn murder to reflect the fact that the victim had indeed been a blood type A secretor, a crucial fact that she had omitted from her original report and from her testimony.

---

[2]Justice Brown concurred that sufficient evidence existed to sustain Apanovitch's conviction, but he found that the death penalty was inappropriate "because the evidence of guilt in this case, while sufficient to meet the various standards which an appellate court must use to measure legal error, is far from overwhelming." *Id.* at 404.

In the summer of 1988, Campbell filed an affidavit,[3] stating that the fact that Flynn had been a secretor had been contained in her notes "used in the course of my examination in this case and was testified to at trial"[4] and that "it was and still is my opinion that the number of spermatozoa . . . from the oral swabs . . . and the identification of seminal acid phosphates demonstrates sufficient concentration of semen to validate the blood group determination of 'A'" for the perpetrator.[5] Yet none of Campbell's trial notes had been made available to the defense, and so it seems that the only serological evidence to which Apanovitch had access before or during trial had been Campbell's report that remained silent as to the victim's secretor status. Much later, in 1992, Apanovitch discovered that the police had apparently been made aware of the victim's secretor status during the first few days of their investigation.

His direct appeals having been fruitlessly exhausted, Apanovitch filed a petition to vacate or set aside judgment (the "first post-conviction petition") with the Cuyahoga County Court of Common Pleas on June 2, 1988. Apanovitch therein argued, in relevant part, that (1) the new serological evidence (based on the state Supreme Court's dissent and Campbell's subsequently-amended report) demonstrated that his trial counsel had been rendered ineffective by their ignorance, and that the evidence's omission had violated due process because it was not made available to him before trial; (2) the out-of-court statements of two witnesses (Hammon and Goetchius) had been improperly admitted into evidence, and Apanovitch's trial counsel had been unconstitutionally ineffective in failing to request a jury instruction limiting the admissibility of out-of-court statements to impeachment purposes only; and (3) in light of this newly-discovered evidence, there was insufficient evidence to sustain the conviction. In response to this filing, the state Supreme Court stayed Apanovitch's execution, effective June 8, 1988. *State v. Apanovitch*, 532 N.E.2d 765 (Ohio 1988). The Court of Common Pleas dismissed this first petition for post-conviction relief on April 7, 1989. In its decision, the court concluded, *inter alia*, that Apanovitch had failed to demonstrate that the serological evidence was both newly-discovered and material to his conviction.

On April 26, 1989, shortly after the Court of Common Pleas dismissed his first petition, Apanovitch apparently asked the City of Cleveland to provide him access to the homicide investigative file. Presumably unhappy with the city's response, Apanovitch instituted an action in Ohio courts against the City of Cleveland ("mandamus action") on November 29, 1989, seeking a writ of mandamus to secure access to the police investigation records pursuant to Ohio's public records laws as they had been interpreted at that time. This action would not bear fruit for three years, but it is precisely those records that would support the instant appeal because they suggest that the state may have violated Apanovitch's constitutional rights during trial.

On February 6, 1991, the state Court of Appeals granted in part and denied in part Apanovitch's petition for a writ of mandamus, releasing 51 documents *in toto*, plus redacted portions of 15 of 39 other documents he had requested after it had conducted an *in camera* examination of the documents in question. *State ex rel. Apanovitch v. Cleveland*, No. 58867, 1991 Ohio App.

---

[3]It is not absolutely clear when and why Campbell filed this affidavit. The document in our possession notes that it was sworn in July 1988, and received in August by the Court of Common Pleas, but Apanovitch refers to it, or at least to a similar, less-detailed affidavit, in his first postconviction petition of June 1988.

[4]Campbell is incorrect in this latter assertion, for she had testified at trial only that Apanovitch and the perpetrator were both type A secretors.

[5]In asserting that the bodily fluids found in Flynn's mouth and vagina had been emitted by the perpetrator even though Flynn secreted the same blood type, Campbell raised a *post facto* assertion of fact that has not yet been developed and tested in an appropriate forum. As such, it is not properly before us now. As we are remanding to the district court, and as it is possesses the inherent authority to conduct an evidentiary hearing under pre-AEDPA law, we presume that the parties may have an opportunity to pursue this issue should they think it relevant.

LEXIS 663 (Ohio Ct. App. Feb. 6, 1991). However, Apanovitch received no records at that time because he appealed to Ohio's Supreme Court, challenging the Court of Appeals's partial denial of his mandamus petition. He would have to wait for nearly two more years before this action bore fruit.

Meanwhile, on February 11, 1991, the state Court of Appeals denied Apanovitch's appeal from the denial of his first post-conviction petition. *State v. Apanovitch*, 591 N.E.2d 1374 (Ohio Ct. App. 1991). In part, the court held that the purported notation of the victim's secretor status in Barbara Campbell's trial notes, defense counsel's cross-examination of Campbell regarding the secretor status of Apanovitch and the assailant (but not of the victim), and the analysis of Justice Brown (the author of the Ohio Supreme Court's 1987 direct-appeal dissent) "persuade us that the defendant could have addressed this issue at trial or on direct appeal, but did not." *Id.* at 1375. That court also concluded that the real effect of Campbell's secretor testimony had been quite limited because she had explained to the jury that "the test results merely failed to exclude Apanovitch from the 40% of the population who, like the assailant, had type A blood." *Id.* at 1376.

On July 24, 1991, the Ohio Supreme Court summarily dismissed *sua sponte* Apanovitch's appeal from the denial of his first post-conviction petition. *State v. Apanovitch*, 574 N.E.2d 1089 (Ohio 1991). About three weeks later, on August 15, Ohio's Supreme Court lifted its stay of execution.

On November 1, 1991, while his mandamus action remained pending before Ohio's Supreme Court, Apanovitch filed a petition for a writ of habeas corpus in the Northern District of Ohio. The federal court thereafter stayed Apanovitch's execution. On April 15, 1992, Apanovitch filed his first motion to expand the record under Rules 5 and 7 of the Rules Governing 42 U.S.C. § 2254 cases. Specifically, Apanovitch asked the district court to order the State of Ohio to release certain documents that he enumerated and described, none of which were implicated in his separate state mandamus action. The federal district court granted this motion on August 11, 1992, and ordered the state to release (a) certain photographs, (b) the hair found on the victim's hand, (c) the police department homicide file, including a list of detectives, police officers and others who had been present at the crime scene, and (d) any documents indicating the names of people whose hair had been compared to the hair found on the victim's hand. The government did not actually release those documents for several months.

Meanwhile, the state filed a supplemental return of writ in the summer of 1992 in which it explained that swabs of bodily fluids found in the victim's body, long thought destroyed inadvertently, had been found "in a desk of an employee of the coroner's office who handled the Apanovitch case." The state performed a DNA analysis of the material, and then asked the district court to authorize a comparison of the DNA material in the swabs with Apanovitch's DNA. Apanovitch opposed this motion, arguing that the chain of custody was broken, and that the tests would likely be inaccurate. The district court did not explicitly rule on this motion, though the court noted that it was moot because it subsequently denied Apanovitch's petition.

While Apanovitch awaited the documents that the federal district court had ordered released to him, the Ohio Supreme Court affirmed, in a September 2, 1992 decision concerning several consolidated prisoner mandamus cases, the state Court of Appeals decision to issue a partial writ of mandamus directing the City of Cleveland to release certain records to him. *State ex rel. Williams v. Cleveland*, 597 N.E.2d 147 (Ohio 1992).[6] The records were not released immediately, and so Apanovitch filed a motion on September 16 in the state courts for the release of the records.

---

[6]It is of passing interest that Ohio's Supreme Court significantly altered its approach to investigatory files in 1994, limiting the applicability of a state public records statute to such documents. *State ex rel. Steckman v. Jackson*, 639 N.E.2d 83 (Ohio 1994).

Thereafter, on September 25, Apanovitch filed a second motion in federal district court to expand the record ("second motion"), challenging the Ohio Supreme Court's refusal to release every document for which he had petitioned.

On November 19, 1992, the State of Ohio finally (and fully) complied with the federal district court's August 11 order to release certain documents to Apanovitch (none of which were implicated in his separate mandamus action). Six weeks later, on December 30, the City of Cleveland fully complied with Ohio's Supreme Court's partial grant of a writ of mandamus, releasing to Apanovitch 51 documents *in toto* and 15 others that had been redacted.

Among the documents released by the City of Cleveland, Apanovitch discovered evidence that, he claims, reveals that the State of Ohio committed several *Brady* violations during his trial. First, Apanovitch discovered among police handwritten investigative notes (author unknown), dated August 23, 1984, a notation that both Apanovitch and the victim were blood type A secretors, a fact that the prosecution did not reveal to the defense before trial. Second, he found a report, apparently prepared by one of the detectives, that summarized a telephone conversation between Apanovitch and the report's author prior to Apanovitch's indictment, wherein it was written that Apanovitch had asked the officer to let him know before arresting him "*if* I am indicted." (emphasis added). Of course, this stands in sharp contrast to Detective Zalar's trial testimony that Apanovitch had said "*when* I am indicted," and this also gives the lie to the prosecution's stipulation to the trial judge that no written evidence of this conversation had been contained in the investigation report. Apanovitch also discovered other materials among the investigation record that, he claims, reveals other *Brady* violations. In February 1993, Apanovitch filed a third motion with the district court to expand the record to include this newly-uncovered evidence ("third motion"), along with an amended petition.

On July 28, 1993, without addressing Apanovitch's second or third motions to expand the record, his proposed amended petition, or the State of Ohio's motion to compare Apanovitch's DNA to that found on the rediscovered swabs, the district court dismissed the petition. On August 10, Apanovitch filed a post-judgment motion asking the federal district court to alter its judgment, and the State of Ohio responded by filing its own motion to alter judgment. In its motion, the state again asked the district court to authorize a test that would compare Apanovitch's DNA to that found on the swabs that had been rediscovered in a drawer in the coroner's office. On December 28, 1993, the district court denied both motions. Apanovitch appealed on January 26, 1994, and the district court granted a certificate of probable cause for appeal on February 1. On March 11, 1994, Apanovitch filed a motion asking us to hold his appeal in abeyance pending further state court actions. We granted that motion on May 9, 1994.

Returning to the state courts, Apanovitch filed a successor petition to vacate or set aside judgment (the "second postconviction petition") on March 11, 1994, relying on the new evidence he had gathered as a result of the documents he received in 1992, and he subsequently filed three amendments to this petition. The state filed a motion to dismiss this second postconviction petition in December 1994, and the Court of Common Pleas granted the state's motion on March 13, 1995, holding that the federal district court's denial of the habeas petition had binding *res judicata* effect. Apanovitch appealed.

Meanwhile, Apanovitch filed a Freedom of Information Act ("FOIA") petition, seeking to obtain the results of the Federal Bureau of Investigation's ("FBI") fingerprint analysis. On July 7, 1995, Apanovitch received certain documents from the FBI pursuant to this request, and so the District Court for the District of Columbia dismissed Apanovitch's FOIA action as moot on July 25, 1995. These documents confirmed that investigators had not found any of Apanovitch's fingerprints at the crime scene.

On November 30, 1995, the state Court of Appeals denied Apanovitch's appeal from the denial of his second postconviction petition because Apanovitch had failed to raise the claims in state courts first, and because the federal court's ruling had *res judicata* effect. *State v. Apanovitch*, 667 N.E.2d 1041 (Ohio Ct. App. 1995). Apanovitch appealed. On May 8, 1996, the Ohio Supreme Court declined to take jurisdiction. *State v. Apanovitch*, 663 N.E.2d 1302 (Ohio 1996).

While his appeal from the Court of Common Pleas's denial of his second postconviction petition remained pending in Ohio's Supreme Court, Apanovitch filed another successor petition for postconviction relief ("third postconviction petition") with the Court of Common Pleas. This motion was based on the results of the FBI's latent fingerprint analysis. On November 27, 1995, the Court of Common Pleas dismissed the third postconviction petition, holding that the withheld evidence was not exculpatory. Apanovitch appealed.

The state Court of Appeals then affirmed the trial court's denial of Apanovitch's third postconviction petition on August 19, 1996. *State v. Apanovitch*, 681 N.E.2d 961 (Ohio Ct. App. 1996). He appealed, but the Ohio Supreme Court declined to take jurisdiction on December 20, 1996. *State v. Apanovitch*, 673 N.E.2d 146 (Ohio 1996).

His state court proceedings having been exhausted, our order of abeyance was lifted. On December 23, 1996, Apanovitch filed a motion to remand the proceedings to the district court in order to conduct an evidentiary hearing. Regrettably, and unaccountably, we took no action on that motion for nearly eight years. Finally, after Apanovitch himself prompted us to act by filing a motion to expedite in 2002, we denied his motion to remand on October 19, 2004. Apanovitch then filed a motion to expand the record on April 14, 2005, and we granted that motion in part on June 15, 2005, expanding the record to include missing pages from the trial transcript and all pleadings and exhibits that were part of the federal district court record, but denying the motion with respect to records from Apanovitch's second and third state post-conviction proceedings. As such, we shall limit our review to documents that were placed before the district court, including documents attached to Apanovitch's unsuccessful motions to the district court to expand the record. Briefing on the merits of the instant appeal followed.

## II

We apply the pre-AEDPA standard of review because Apanovitch filed his habeas corpus petition before the enactment of the Antiterrorism and Effective Death Penalty Act of 1996. *Harries v. Bell*, 417 F.3d 631, 634-35 (6th Cir. 2005)*; Lindh v. Murphy*, 521 U.S. 320, 326 (1997). That standard entitles Apanovitch to have the federal habeas court "make its own independent determination of his federal claim, without being bound by the determination on the merits of that claim reached in the state proceedings." *Buell v. Mitchell*, 274 F.3d 337, 344 (6th Cir. 2001) (quoting *Wainwright v. Sykes*, 433 U.S. 72, 87 (1977)). A district court may grant the writ if the state conviction violated the Constitution, laws, or treaties of the United States. *Estelle v. McGuire*, 502 U.S. 62, 68 (1991).

Under these circumstances, we review the district court's dispositions of habeas petitions *de novo*, and its findings of fact for clear error. *Rickman v. Bell*, 131 F.3d 1150, 1153 (6th Cir. 1997). We must defer to the state courts' findings with respect to primary or historical facts, which are rebuttable only by clear and convincing evidence, while we review state court determinations of federal law or mixed questions of federal law and fact *de novo*. *Coleman v. Mitchell*, 244 F.3d 533, 538 (6th Cir. 2001). We generally may not review claims that were not substantively decided by state courts because only claims adjudicated on the merits in state court proceedings are cognizable on habeas review:

When a habeas petitioner fails to obtain consideration of a claim by a state court, either due to the petitioner's failure to raise that claim before the state courts while state-court remedies are still available or due to a state procedural rule that prevents the state courts from reaching the merits of the petitioner's claim, that claim is procedurally defaulted and may not be considered by the federal court on habeas review.

*Seymour v. Walker*, 224 F.3d 542, 549-50 (6th Cir. 2000) (citations omitted), *cert. denied*, 532 U.S. 989 (2001). *See Rose v. Lundy*, 455 U.S. 509, 518-19 (1982); *Lancaster v. Adams*, 324 F.3d 423, 436-37 (6th Cir. 2003). We apply a four-factor test to determine if a claim has been procedurally defaulted:

First, the court must determine whether there is such a procedural rule that is applicable to the claim at issue and whether the petitioner did, in fact, fail to follow it. Second, the court must decide whether the state courts actually enforced [their] procedural sanction. Third, the court must decide whether the state's procedural forfeiture is an adequate and independent ground on which the state can rely to foreclose review of a federal constitutional claim. This question will usually involve an examination of the legitimate state interests behind the procedural rule in light of the federal interest in considering federal claims. And, fourth, the petitioner must demonstrate, . . . that there was "cause" for him to neglect the procedural rule and that he was actually prejudiced by the alleged constitutional error.

*Greer v. Mitchell*, 264 F.3d 663, 672-73 (6th Cir. 2001) (internal citations and quotation marks omitted), *cert. denied*, 535 U.S. 940 (2002). *See Maupin v. Smith*, 785 F.2d 135, 138 (6th Cir. 1986) (establishing standard for determining whether an issue has been procedurally defaulted).

If an issue has been procedurally defaulted, we may still review it under certain circumstances. "A petitioner may avoid . . . procedural default only by showing that there was cause for the default and prejudice resulting from the default, or that a miscarriage of justice will result from enforcing the procedural default in the petitioner's case." *Seymour*, 224 F.3d at 550 (citing *Wainwright v. Sykes*, 433 U.S. at 87, 90-91). Withholding of documents in violation of *Brady v. Maryland*, wherein the Supreme Court ruled that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution," 373 U.S. at 87, implicitly constitutes a *per se* excuse ("cause" and "prejudice") for procedural default in habeas review, as the Court has recently stated:

*Brady*, we reiterate, held that "the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." We set out in *Strickler v. Greene* [527 U.S. 263 (1999)] the three components or essential elements of a *Brady* prosecutorial misconduct claim: "The evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; that evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." "[C]ause and prejudice" in this case "parallel two of the three components of the alleged *Brady* violation itself." Corresponding to the second *Brady* component (evidence suppressed by the State), a petitioner shows "cause" when the reason for his failure to develop facts in state-court proceedings was the State's suppression of the relevant evidence; coincident with the third *Brady* component (prejudice), prejudice within the compass of the "cause and prejudice" requirement exists when the suppressed evidence is "material" for *Brady* purposes.

*Banks v. Dretke*, 540 U.S. 668, 691 (2004) (citations omitted).  Therefore, to the extent that Apanovitch successfully demonstrates that the state committed *Brady* violations with respect to specific issues, we may exercise jurisdiction.  To reiterate, to assert a cognizable *Brady* claim, a habeas petitioner must show that (1) evidence favorable to the petitioner, whether exculpatory or for impeachment purposes (2) was suppressed by the government, and (3) the petitioner suffered prejudice as a result.  *Strickler v. Greene*, 527 U.S. 263, 281-82 (1999).  While the *Brady* rule encompasses both exculpatory and impeachment evidence, *United States v. Bagley*, 473 U.S. 667, 676 (1985), it only applies to evidence that was known to the prosecution, but unknown to the defense, at the time of trial, and the duty to disclose applies even if the defense made no request.  *United States v. Agurs*, 427 U.S. 97, 103, 107 (1976).  The *Brady* disclosure requirement extends to evidence that is known only by the police, but withheld from the prosecution.  *Kyles v. Whitley*, 514 U.S. 419, 438 (1995).

When analyzing a petitioner's contention that he suffered prejudice, we assume that the petitioner has stated a claim of constitutional magnitude, and proceed to discern whether the petitioner was actually prejudiced by the asserted errors.  *United States v. Frady*, 456 U.S. 152, 170-72 (1982); *Moore v. Carlton*, 74 F.3d 689, 691-92 (6th Cir. 1996).  The prejudice must have worked to the petitioner's actual and substantial disadvantage, thereby infecting his entire trial with an error of constitutional dimension.  *Frady*, 456 U.S. at 170.  The failure to disclose such evidence is "material," and therefore "prejudicial," only "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *Strickler*, 527 U.S. at 280, 282 (quoting *Bagley*, 473 U.S. at 682); *accord Spirko v. Mitchell*, 368 F.3d 603, 609 (6th Cir. 2004), *cert. denied sub nom. Spirko v. Bradshaw*, 544 U.S. 948 (2005); *Armstrong v. Morgan*, 372 F.3d 778, 781 (6th Cir.), *cert. denied*, 543 U.S. 982 (2004); *Zuern v. Tate*, 336 F.3d 478, 484 (6th Cir. 2003), *cert. denied*, 540 U.S. 1198 (2004); *United States v. Brown*, 332 F.3d 363, 369 (6th Cir. 2003).

A "reasonable probability" of a different outcome exists where the government's suppression of evidence undermines confidence in the outcome of the trial.  *Kyles*, 514 U.S. at 434 (citing *Bagley*, 473 U.S. at 682); *Mason v. Mitchell*, 320 F.3d 604, 628 (6th Cir. 2003).  The petitioner

> must convince us that "there is a reasonable probability" that the result of the trial would have been different if the suppressed documents had been disclosed to the defense.  As we stressed in *Kyles*, "The adjective is important: The question is *not* whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence."

*Strickler*, 527 U.S. at 289-90 (quoting *Kyles*, 514 U.S. at 434) (emphasis added); *accord United States v. Crayton*, 357 F.3d 560, 569 (6th Cir.), *cert. denied*, 542 U.S. 910 (2004).  Put another way, the *Brady* standard's prejudice is different from a more conventional prejudice analysis:

> the materiality inquiry is not just a matter of determining whether, after discounting the inculpatory evidence in light of the undisclosed evidence, the remaining evidence is sufficient to support the jury's conclusions.  Rather, the question is whether "the favorable evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict."

*Strickler*, 527 U.S. at 290 (quoting in part *Kyles*, 514 U.S. at 434-35) (citations omitted).  A *Brady* claim thus does not require showing that the introduction of the exculpatory evidence would have rendered the overall evidence insufficient to convict.  *Kyles*, 514 U.S. at 434-35; *United States v. Frost*, 125 F.3d 346, 383 (6th Cir. 1997).  Further, the withheld items of evidence must be

considered collectively, not individually, to determine materiality. *Castleberry v. Brigano*, 349 F.3d 286, 291 (6th Cir. 2003).

Finally, we generally will not consider claims that the petitioner failed to raise first in the district court. As we have stated,

> [o]ur function is to review the case presented to the district court, rather than a better case fashioned after a district court's unfavorable order. For that reason, it is well settled law that this court will not consider an error or issue which could have been raised below but was not.

*Barner v. Pilkington N. Am., Inc.*, 399 F.3d 745, 749 (6th Cir. 2005) (internal citations and quotation marks omitted). Moreover, "we will reverse a district court's decision to admit or exclude evidence only if we find that the district court has abused its discretion." *Id.* at 748 (citing *Beck v. Haik*, 377 F.3d 624, 636 (6th Cir. 2004)). "An abuse of discretion occurs when the district court "relies on clearly erroneous findings of fact, . . . improperly applies the law, . . . or . . . employs an erroneous legal standard." *Ibid.* (citations and internal quotation marks omitted).

Apanovitch originally requested, and the state continues to request, that we remand various matters to the district court for an evidentiary hearing.[7] As a pre-AEDPA case, there is greater scope for granting evidentiary hearings than under today's law. "Generally, a habeas petitioner is entitled to an evidentiary hearing in federal court if the petition 'alleges sufficient grounds for release, relevant facts are in dispute, and the state courts did not hold a full and fair evidentiary hearing.'" *Stanford v. Parker*, 266 F.3d 442, 459 (6th Cir. 2001), *cert. denied*, 537 U.S. 831 (2002) (quoting in part *Wilson v. Kemna*, 12 F.3d 145, 146 (8th Cir. 1994)). However, "bald assertions and conclusory allegations do not provide sufficient ground to warrant requiring the state to respond to discovery or to require an evidentiary hearing." *Id.* at 460 (quoting *Zettlemoyer v. Fulcomer*, 923 F.2d 284, 301 (3d Cir. 1991)). *See Bowling v. Parker*, 344 F.3d 487, 512 (6th Cir. 2003); *cf. Sawyer v. Hofbauer*, 299 F.3d 605 (6th Cir. 2002). We note that these "condition[s may be] more properly addressed by the district court in the first instance." *DiCenzi v. Rose*, 452 F.3d 465, 472 (6th Cir. 2006). *See also Giles v. Schotten*, 449 F.3d 698, 700 (6th Cir. 2006). Of course, even a pre-AEDPA habeas petitioner who is not *entitled* to an evidentiary hearing may nevertheless receive one at the court's discretion. *Harries v. Bell*, 417 F.3d 631, 635 (6th Cir. 2005) (" a district court does have the inherent authority to order an evidentiary hearing even if the factors requiring an evidentiary hearing are absent.") (quoting *Abdur'Rahman v. Bell*, 226 F.3d 696, 705 (6th Cir. 2000), *cert. denied*, 534 U.S. 970 (2001)).

## III

In this appeal, Apanovitch raises four fundamental issues: (A) whether the state committed any of seven claimed *Brady* violations by failing to disclose documents with respect to (1) a police report on statements made by Apanovitch, (2) coroner notes concerning an unidentified hair on the victim's body, (3) documents reflecting that the police knew that the victim was a blood type A secretor, (4) documents reflecting that other people may have enjoyed access to the victim's home, (5) evidence that could have been used to impeach the prosecution's witnesses, (6) evidence that the police had investigated other possible suspects in the murder, and (7) documents that may have

---

[7] We note that, in 2004, we dismissed Apanovitch's 1996 motion to remand for an evidentiary hearing. Our denial of his previous motion to remand for an evidentiary hearing was predicated on our decision that the time was not yet ripe for a remand because the issues had not been squarely presented to us, so that we had not yet enjoyed the opportunity to review the merits of his claims. As such, our denial was not based on a review of the merits of his claims, and we are not precluded from granting such a remand now that we have had the chance to review both parties' claims in detail.

impeached the coroner's report with respect to the time of Flynn's death; (B) whether the trial court improperly admitted Howard Hammon's testimony; (C) whether the trial court improperly admitted inflammatory and prejudicial hearsay respecting the victim's state of mind; and (D) whether sufficient evidence exists to support the conviction. We shall address each of these issues *seriatim*.

## A

### 1

The first claimed *Brady* violation arises from the evident conflict involving the trial testimony of Detective Anthony Zalar, and a document in which Apanovitch is said to have made a different statement. At trial, Detective Zalar testified that Apanovitch had called him before he was indicted, and he had "asked me when he's indicated [sic] would I please contact him first rather than just go arrest him. I guess his mother has a heart problem so that he could inform his mother first so she would know before he's arrested." Defense counsel objected because the prosecution had not previously disclosed this statement. The prosecution informed the court that this had been an oral statement and that, as such, there was no written record of the conversation that could have been disclosed. The court, having been duped, overruled the objection, stating:

> Well, obviously if it wasn't in the police report and this is the first knowledge you had of them in talking to the officer, you couldn't have given them the discovery, but I think it's lack of something on the part of the police department that these things that you feel are important enough to bring into evidence, if you feel they are important to testify about, then they . . . should have been important enough to put into the police report.

On cross-examination, Detective Zalar stated that he had been "stunned" when Apanovitch said "when I am indicted," but he did not recall writing that statement in his report. Defense counsel then asked to see the detective's written report, and so the court instructed Zalar to review his report for a record of the exchange. However, the prosecution stipulated that the statement was not in the report, and the court imprudently decided that the prosecuting attorney's stipulation was credible and sufficient.

Apanovitch first raised this issue in his direct appeal to the state courts, wherein he argued that the court had erred in allowing testimony respecting his oral statements when those statements were not provided to defense counsel beforehand. The state court of appeals denied this claim, holding that, in the first place, the prosecutors did not violate their duties of disclosure because "they just learned of these statements on the morning Zalar was to testify. . . . Taken as true, the trial court certainly could have concluded that Crim R. 16 was not in fact violated." Second, the state court held that the trial court did not abuse its discretion in permitting that testimony. Later, in his habeas petition, Apanovitch again raised the claim that the admission of Zalar's testimony constituted a denial of due process, confrontation, and equal protection. The federal district court addressed this as a purely evidentiary question, and, because federal courts cannot question state court rulings on evidence unless they "result in a denial of fundamental fairness," the district court denied this claim in its entirety. *Walker v. Engle*, 703 F.2d 959, 962 (6th Cir. 1983), *cert. denied*, 470 U.S. 1050 (1985).

However, prior to the district court's denial of the habeas petition, Apanovitch received, apparently as part of the December 30, 1992 set of documents released by the city of Cleveland pursuant to the writ of mandamus, a set of typed police investigative reports prepared by Detectives Bornfield and Zalar. These notes included, *inter alia*, a memorialization by one of the police investigators (presumably Zalar, but it is not absolutely clear to us which detective filed the item) of the telephone conversation in question. The relevant portion of the report stated:

> While typing this report, received a phone call from Anthony Apanovitch. He again stated that he was not responsible for this crime. He did request that *if* he was arrested or indicted in connection with this crime, that he be contacted first, so that he can break the news to his mother.

(emphasis added). This newly-discovered evidence directly contradicts the prosecution's stipulation to the state trial court that Detective Zalar's recollection of Apanovitch's oral statement had never been written down (justifying its non-disclosure), and it strongly impeaches Detective Zalar's testimony that Apanovitch had used the word "when," and, moreover, that he had been "stunned" when Apanovitch had used that word. Apanovitch raised this issue in his third motion to expand the record, claiming that the state's failure to disclose this document constituted a *Brady* violation that resulted in a denial of due process. The district court did not grant Apanovitch's third motion to expand the record, and so it did not review this new evidence in rendering its decision. Apanovitch maintains this claim on appeal.

First we must address the issue of waiver, for Apanovitch did not raise this claim in his original § 2254 petition, nor did he raise it explicitly in his amended petition. However, he raised it in the memorandum in support of his third motion to expand the record, wherein he addressed the facts underlying this claim and argued that the state violated *Brady* in not providing evidence of this statement to his counsel. Although Apanovitch did not raise this precise claim in his original or amended federal habeas petitions, he did raise a complaint regarding the prosecution's failure to disclose the "if/when" oral statements prior to trial, a complaint that he had raised in his direct state appeal as well. Since he raised the essential issue at an early stage of the litigation, and as he discussed the substance of the instant claim in his brief, Apanovitch's failure to raise this precise issue in the lower courts is excusable, and so the issue has not been waived. *Barner v. Pilkington N. Am.*, 399 F.3d at 749.

Moreover, this precise issue lies in an unusual posture, having been first raised in federal court. Therefore, there is a question of procedural default, for the claim had clearly not been exhausted at the state level before it was raised in federal court. The district court could have dismissed the issue as unexhausted, thereby providing the state courts with the first opportunity to address the claim pursuant to *Rose v. Lundy*, 455 U.S. at 518-20, but the district court instead denied on the merits Apanovitch's petition and his third motion to expand the record. Subsequently, Apanovitch raised this instant *Brady* issue with the state courts in his second postconviction petition. The state courts then ruled that this new evidence was not material, and that *res judicata* also barred them from acting. Apanovitch therefore procedurally defaulted this issue.

As the *Brady* analysis is identical for our purposes with the procedural default excuse analysis, we must ascertain whether the prosecution's withholding of this evidence constituted a *Brady* violation. It is clear to us that (1) the evidence was favorable to Apanovitch because it was clearly impeaching, and (2) the state suppressed the evidence. But it is not immediately apparent to us whether the withheld evidence materially prejudiced Apanovitch. *Strickler v. Greene*, 527 U.S. at 281-82. Therefore we hold that the district court abused its discretion in refusing to grant Apanovitch's third motion to expand the record with respect to this element. *Barner v. Pilkington N. Am.*, 399 F.3d at 748. Since Apanovitch "alleges sufficient grounds for release, [the] relevant facts are in dispute, and the [lower] courts did not hold a full and fair evidentiary hearing," *Stanford v. Parker*, 266 F.3d at 459 (citation and internal quotation marks omitted), we remand this issue to the federal district court for reconsideration, and, if necessary, that court may conduct an evidentiary hearing.

**2**

The second *Brady* claim concerns the precise location of the lone unidentified hair found on the victim's body. At trial, Barbara Campbell testified that an unidentified hair was discovered on the corpse "on the back portion of the hand." She also testified that the hair did not belong either to the victim or to Apanovitch. During the mitigation phase, Campbell testified that she had removed this hair from the palm or surface of the victim's right hand.

Campbell's testimony on this point seems to have been inconsistent with documents that Apanovitch received in December 1992, wherein it is reported that the hair was found on the back of the victim's hand "under her bound hands." Moreover, the police department apparently noted on August 28, 1984, also in documents that Apanovitch received in December 1992, that a "black hair was found by Barbra [sic] Campbell, behind the victims [sic] tied hands." Apanovitch now argues that, because the hair was under the victim's bound hands, between her bound hands and her back (and therefore perhaps unlikely to have fallen there after her death), the hair could have belonged to the actual killer. He further argues that this possibility would have made a difference at trial because either (a) the jury could have suspected that the hair belonged to the real killer, or (b) it could have impeached the prosecution's attempt to minimize the hair's importance.[8]

Apanovitch first raised this argument in his amended § 2254 petition, and it was substantiated by the documents he had received in late 1992 from the state pursuant to his collateral mandamus action. Therefore this claim presents many of the same procedural default issues as the first claim; as with the previous issue, we find that he has procedurally defaulted. For *Brady* analysis, this document may have been favorable to the accused, because it could have impeached the prosecution's attempt to downplay the hair, and it also could have introduced some measure of doubt as to the killer's identity. It is beyond question that the state suppressed this evidence. More difficult is the question of prejudice. To be sure, Campbell's guilt-phase testimony (that the hair was found "on the back portion of the hand") could possibly be interpreted as consistent with one part of the investigative report (that the hair was found "behind the victims [sic] tied hands"),[9] but her testimony is distinct from that which is found in her notes (that the hair was found "under her bound hands"). Obviously this evidence must be sorted and tested, and it is not our proper role to do so. *Barner v. Pilkington N. Am.*, 399 F.3d at 749. Therefore, we hold that the district court abused its discretion in refusing to grant Apanovitch's third motion to expand the record with respect to this element. *Id.* at 748. We remand this issue for the district court to reconsider and, if necessary, to conduct an evidentiary hearing.

**3**

The third claimed *Brady* error involves the serological evidence. Although the government generally informed the jury that there was no physical evidence directly tying Apanovitch to the

---

[8]In its closing argument, the prosecution sought to minimize the hair's import by stating that "It could have been found in transport and it was inconsistent with his hair. That's all. It could have been consistent with 14 or 15 other people." Pursuant to Apanovitch's first motion to expand the record in April 1992, the district court ordered, in August 1992, the state to produce information regarding who had had contact with the corpse. That information was delivered in November 1992. It is presently unclear to us whether anyone has conducted any tests to discover to whom the hair might belong.

[9]This is not to say that there is no distinction: the "back portion" of bound hands could refer to the heel portion of the hand, which, when the hands are bound, would have been facing *out* and *away* from her body (consistent with the mitigation phase testimony). To the contrary, "behind the tied hands" would seem to refer more clearly to the portion of the hands that would have been *underneath* the bound hands (thus, between the hands and the body), which is precisely Apanovitch's contention.

crime scene, nevertheless the prosecutors insinuated that he was linked to the crime because Barbara Campbell had found evidence that the perpetrator was undoubtedly a blood type A secretor, just like Apanovitch. Campbell testified at trial that her tests of the body fluids swabbed from the victim's mouth and vagina revealed that there was "seminal acid phosphatase" present, and that blood tests of the swabs revealed that the fluid had been emitted by a blood type A secretor. She further testified that 80% of all people secrete their blood type "from either tears, saliva, perspiration or seminal fluid." Finally, she stated that Apanovitch was "also a blood group A and *also* a secreter [sic]." (emphasis added). Campbell's report, which was given to the defense prior to trial, noted that the victim had blood type A and that Apanovitch was a secretor of blood type A. The report did not state that the victim was a type A secretor, and so the defense had no reasonable means of ascertaining that fact.

So important did the prosecution think Campbell's testimony that it specifically referred to the serological evidence in its closing argument, emphasizing that the "individual who in fact raped here [sic] or the semen that was found inside of her body in different cavities was a type A – what's the word, secreter [sic]." At the penalty phase hearing, the prosecution argued that even though one could "fill Cleveland Stadium with the men in this town that were Type A, secreters [sic]," nevertheless, "if he would have been a Type B, secreter, he wouldn't be in this courtroom." The government thus accorded importance to the serological evidence, even though, logically, it only indicated that Apanovitch was not *excluded* as a suspect, and had marginal affirmative probative value.

As we noted above, the victim's serological status first became a live issue for appeal when Justice Herbert Brown, writing a partial dissent to the Ohio Supreme Court's dismissal of Apanovitch's direct appeal, stated "What troubles me is that the pathological report indicates that the *victim* was also in blood group A." *State v. Apanovitch*, 514 N.E.2d at 405 (Ohio 1988). Justice Brown hypothesized that, were the victim herself numbered among the vast majority of people who secrete their blood type, then the serological testimony would have been further enfeebled because the evidence from the swabs may not have distinguished between the perpetrator's blood type and that of the victim. Indeed, the justice argued that it could have been possible that the perpetrator did not even have blood type A in such a situation. *Id.* at 405-06. Of course, Justice Brown's dissent was entirely moved by a spirit of speculation, as there is no evidence that the justice had any actual knowledge of the problem with the state's serological evidence which he presciently discussed.

Presumably in response to Justice Brown's dissent, Campbell took it upon herself to alter her report in 1988, adding the fact that the victim was a blood type A secretor. She filed an affidavit shortly thereafter pursuant to Apanovitch's first postconviction petition, claiming that Flynn's serological status had been contained in Campbell's trial-preparation notes (a statement the truth of which we are presently ignorant), that Campbell had testified to the victim's serological status (which is untrue), and that it remained her professional opinion that the fluid tested in the swabs came from a man (an assertion of expert opinion not tested at trial). In consequence, Apanovitch asserted in his first postconviction petition that the government had failed to provide documents about the victim's serological status, and that his attorney had been ineffective for having failed to question Campbell about the victim's serological status in his first postconviction petition.

The state courts denied that petition, holding that the serological evidence was neither newly-discovered nor material to the trial's outcome. In reaching the latter conclusion, the Ohio Supreme Court minimized the import of the serological evidence, focusing instead on the fact that Campbell had testified that (1) there was no physical evidence tying Apanovitch to the crime scene, and that (2) many men were also blood type A secretors. There this issue stood until December 1992, when Apanovitch received documents that made it apparent that the police department had been in possession of the victim's full serological status prior to the trial. Apanovitch sought to add this information to the record before the district court in his third motion to expand the record. However,

the district court denied that motion at the same time that it denied Apanovitch's petition. In denying the third motion to expand the record and then dismissing the petition, the federal district court reasoned that the clear distinction in Ohio law separating the coroner's office from the police department meant that no *Brady* violation had occurred with respect to the serological evidence because the police did not possess this information prior to trial. That may have been a reasonable conclusion based on the information properly before the district court, but the evidence received by Apanovitch in late December 1999 strongly suggests that the police did possess the coroner's information.

We find that Apanovitch has procedurally defaulted on this issue because, although he raised it directly with the state courts first, the state courts nevertheless dismissed his claim on purely procedural grounds, holding that "[t]he doctrine of *res judicata* prohibits our consideration of these serological test issues which could have been raised by the defendant at trial or on direct appeal." *State v. Apanovitch*, 591 N.E.2d at 1375. However, the state has waived the procedural default argument, and so we will not treat this claim as having been defaulted.

We also find that it is possible that the state committed a *Brady* violation with respect to the serological evidence. First, the evidence would seem to have been mildly exculpatory in the sense that it may have undermined any inference that the serological evidence linked Apanovitch to the crime. On the other hand, even on the prosecution's view, the evidence was extraordinarily weak, in that 30-40% of all men had the same blood type and secretor status, which is virtually no evidence at all. Moreover, the state undoubtedly suppressed this evidence until its hand was forced by the Ohio Supreme Court's writ of mandamus. As with the two aforementioned *Brady* claims, however, it is presently beyond our ken whether the suppression of this potentially exculpatory evidence prejudiced Apanovitch at trial. Therefore, we hold that the district court abused its discretion in refusing Apanovitch's third motion to expand the record with respect to this claim. We remand this issue to the district court for reconsideration and, if it deems it appropriate, an evidentiary hearing to determine whether the state violated *Brady* in withholding the serological evidence from Apanovitch's counsel before and during trial.

**4**

Apanovitch next argues that the prosecution withheld evidence that the police had gathered with respect to other individuals who had enjoyed access to the victim's residence, including (1) a pregnant woman whom the victim had assisted, in part by giving her a set of house keys, as well as that woman's boyfriend, (2) other women to whom the victim had also given her keys as part of her membership in a women's network, (3) an exterminator who kept a set of Flynn's house keys, and (4) approximately twenty-eight men whom Flynn had met through personals advertisements in local magazines.

Petitioner derived all of the evidence regarding this issue from the city of Cleveland's December 1992 compliance with the Ohio Supreme Court's writ of mandamus, and so this issue was not presented first before the state courts, nor was it raised in Apanovitch's habeas petition, although he did include them as part of the amended petition he filed along with his third motion to expand the record in February 1993. The federal court dismissed Apanovitch's habeas petition without explicitly ruling on his third motion to expand the record, and the state courts subsequently rejected this issue on *res judicata* grounds with respect to his second postconviction petition. This issue is thus procedurally defaulted. However, despite the fact that Apanovitch did not raise this issue in his original habeas petition, we will not treat it as abandoned because he raised the issue in his amended petition.

With respect to the *Brady* and related procedural default excuse analysis, Apanovitch has clearly shown that the government suppressed the evidence. However, it is a closer call with respect

to whether the evidence was exculpatory and whether it materially affected the trial's outcome. Apanovitch argues that the information regarding the individuals who had enjoyed access to Flynn's house keys would have been favorable and significant because Flynn's neighbor testified that she heard the front door of Flynn's residence slam shut at approximately 10 p.m., at which time another witness saw the victim on the back porch, entering her house through the rear door. Moreover, the boyfriend of one of the women who had lived with Flynn allegedly had entered the house through a basement window in the past, according to a neighbor's (undisclosed) statement to the police. Apanovitch argues that this information could have been used to impeach the state's theory that the perpetrator entered through the basement window.

While this evidence may have been somewhat exculpatory or impeaching, nevertheless we do not believe that it has affected the trial's outcome in a material fashion because it does not directly contradict the state's evidence. Therefore, we find that although Apanovitch alleged an excuse for his procedural default, he has not alleged a *Brady* violation because he suffered no prejudice from the state's failure to reveal this evidence.

Similarly, Apanovitch alleges that the victim received telephone calls from "weird" men she had met at clubs. Apanovitch argues that this information is favorable because it indicates that other men had knowledge of the layout of Flynn's home, that those men may have made sexual advances toward the victim, and that he suffered prejudice because he was unable to interview them. However, there is no suggestion that the police had any leads with respect to those men, and there is no evidence that any of them may have been even remotely involved. Therefore, we find that the possibility that this evidence might reasonably have affected the trial is simply too remote to have been prejudicial or even exculpatory, and so the government did not commit a *Brady* violation in failing to disclose this evidence.

**5**

Apanovitch further maintains that the prosecution withheld several items of evidence with which he could have impeached government witnesses at trial. He asserts that the prosecution never provided him with information that some of the victim's friends never mentioned that she had expressed any fear of a "painter" or of Apanovitch. These friends also told the police that the victim had experienced trouble with a former tenant, that she was afraid of unknown persons who had recently stolen her purse (and who had subsequently contacted her), that her carpet cleaner and exterminator had both expressed sexual interest in the victim, and that her former boyfriend had threatened her in the past.

Apanovitch believes this information would have been helpful to his defense in that he could have used it to impeach the government's evidence that the victim had feared a "painter." Specifically, he argues that the evidence would have shown that some of the victim's friends knew of no such fear, and that she was afraid of other men, some of whom had knowledge of the layout of her home.

Furthermore, Apanovitch argues that the police reports show inconsistencies between what some witnesses told the police and what they said in their trial testimony. Detective Bornfield testified that witnesses heard someone walk into Flynn's house at 10 p.m., but he reported in his suppressed investigative notes that one witness had "heard the victim on the back porch" between 9 p.m. and 10 p.m. Another witness testified at trial that he saw Flynn arrive home at precisely 10 p.m., but the suppressed police report states that he had observed Flynn enter the rear door of her home between 10:30 p.m. and 11:30 p.m. Apanovitch claims that this undisclosed evidence would have impeached the testimony of the state's witnesses concerning the time that Flynn arrived home. He also claims that one neighbor's first statement to the police raises the possibility that the perpetrator may have entered Flynn's home through the front door, contradicting the state's theory

that the perpetrator entered the house through the basement window. Apanovitch also argues that he could have impeached the neighbors who testified to hearing a loud noise from Flynn's side of the duplex around 11:30 or midnight on the evening of her murder because newly-discovered evidence suggests that they did not inform the police of this fact eighteen hours after allegedly hearing the noise.

Apanovitch has not demonstrated that the absence of any of this evidence undermined confidence in the verdict, and so we find that the absence of this evidence did not prejudice him. Therefore, we deny his appeal as it pertains to this claim.

**6**

Apanovitch claims that the police record he received via Cleveland's December 1992 compliance with the Ohio Supreme Court's writ of mandamus reveals information on numerous other suspects in the victim's murder, including former tenants, boyfriends, and neighbors. For instance, he notes that the records contain information that the victim feared Harold Burgess, whom she had evicted shortly before she was killed, and that witnesses had told police that "He was a drunk and loud mouth and he left on bad terms with the victim." Apanovitch also notes that one of Flynn's friends had reported that the victim's former boyfriend may have had a reason to kill her. Police picked up another man, but soon released him. Another description of a suspicious man in the area may have matched the description of the boyfriend of a woman who had lived with Flynn. The victim also feared another man who had stolen her purse and, according to a friend, she had "started receiving phone calls from a male who told her that it sure would be nice if there was a reward for the return of her purse." The police had also learned that a man had lived with Harold and Mary Burgess in the rental portion of the duplex for a short time and "on one occaision [sic] when her husband was out, this male came up to her bedroom and tried to rape her [Mary Burgess]. After moving out, this male returned 2 or 3 times . . . ." Another neighbor apparently implicated an entire neighborhood family, stating that they were notorious burglars.

Apanovitch argues that he could have used this information to impeach the testimony of police officers at his trial. However, the information does not even indirectly link any of the suspects to the murder. We hold that this information was simply too remote to have been exculpatory or to undermine confidence in the verdict. Therefore we deny Apanovitch's appeal as it pertains to this issue.

**7**

The coroner testified that she could not be very precise as to the time of death, but estimated it to have been between midnight and 6 a.m. Apanovitch discovered in the records turned over to him in December 1992 that Detective Bornfield had stated in a letter to the FBI that Flynn's death was believed to have occurred between 11:30 p.m. and midnight. Other detectives reported that the "time of death between 122.00 [sic] and mid night [sic]." Apanovitch argues that this information, had it been disclosed, would have reinforced his alibi. We find that Apanovitch has simply referred to the suspicions of police officers at an inchoate stage of the investigation, and we hold that the officers' statements would not have reasonably impeached the testimony of the coroner. Therefore, we deny Apanovitch's appeal as it pertains to this issue.

**B**

Next, Apanovitch argues that the trial court's decision to allow Howard Hammon to testify, even though he had already recanted the statement that he had made to the prosecutor suggesting that Apanovitch had admitted to the crime, constituted a violation of due process. Apanovitch raised the issue of Hammon's testimony in the state courts only as an evidentiary matter, not as a federal constitution question, which would normally imply that Apanovitch had procedurally defaulted the

issue. However, the district court held that Apanovitch had not defaulted on this issue: relying on *Picard v. Connor*, 404 U.S. 270 (1971), the district court noted that "as long as the substance of a federal habeas corpus claim is presented to the state courts, the claim will be deemed presented." We agree.

Nevertheless, we find that this claim lacks merit. Apanovitch argues that the trial court improperly admitted the testimony of Howard Hammon. Following the close of the state's case, the prosecution alleged that they had learned that Hammon, who was incarcerated in the same facility as Apanovitch, had heard Apanovitch say, in reference to the crime, "I might have done it, but they'll never prove it. All they have is circumstantial evidence." The prosecution moved to reopen its case to present Hammon's testimony at trial. During *voir dire* before the trial court, Hammon testified that he had lied about Apanovitch's statement and that he had not heard Apanovitch make any inculpatory statements. In light of Hammon's retraction, the trial court denied the prosecution's motion to reopen. Nonetheless, after the defense rested, the trial court called Hammon to testify as a court witness; the court instructed the jury that it should not consider Hammon more important than any other witness, nor should it give him more credibility because he was being called as a court witness. The prosecution repeated the statement that Hammon allegedly had overheard from Apanovitch, and Hammon responded that he had lied in making that statement in the first instance.

Apanovitch has not demonstrated that the trial court's admission of Hammon's original statement violated his due process rights. An issue concerning the admissibility of evidence does not rise to the level of constitutional magnitude unless it can be viewed as being so egregious that Apanovitch was denied a fundamentally fair trial. *McAdoo v. Elo*, 365 F.3d 487, 494 (6th Cir.), *cert. denied*, 543 U.S. 892 (2004). Under federal and Ohio evidentiary law, it is generally improper for the prosecution to impeach its own witness with a prior inconsistent statement when the prosecution knew that the witness had disavowed the prior statement or had claimed not to remember it. *United States v. Zackson*, 12 F.3d 1178, 1184 (6th Cir. 1993); *United States v. Shoupe*, 548 F.2d 636, 641-43 (6th Cir. 1977); *State v. Holmes*, 506 N.E.2d 204, 207 (Ohio 1987); *State v. Liberatore*, 433 N.E.2d 561, 565 (Ohio 1982); *State v. Cantlebarry*, 590 N.E.2d 342, 346 (Ohio. App. 1990). The prosecution may not employ impeachment by prior inconsistent statement "as a mere subterfuge to get before the jury evidence not otherwise admissible." *United States v. Buffalo*, 358 F.3d 519, 522-23 (8th Cir. 2004) (quoting *United States v. Morlang*, 531 F.2d 183, 190 (4th Cir. 1975)); *Zackson*, 12 F.3d at 1184.

Nonetheless, even if the trial court improperly admitted this evidence, it is not clear that such an error amounts to a constitutional violation. While courts have concluded that any violation of this rule constitutes only nonconstitutional error, *Zackson*, 12 F.3d at 1185; *United States v. Clifton*, 406 F.3d 1173, 1179 (10th Cir. 2005), we have held that the admission of such impeachment evidence can constitute a due process violation only under certain limited circumstances. *Shoupe*, 548 F.2d at 643 ("the recitation by the prosecutor of the entire substance of a witness's disavowed, unsworn prior statements, which, if credited by the jury, would be sufficient to sustain a conviction, abridged defendants' right to a fair trial in violation of the Due Process Clause of the 5th Amendment.").

Under the facts of this case, the admission of Hammon's statement did not violate Apanovitch's constitutional rights. Initially, the trial court did not permit the prosecution to call Hammond as a witness, which likely would have been a violation of the evidentiary rule. Rather, Hammon testified as a court witness. While this procedure may seems like an attempt to circumvent the rule precluding the prosecution from calling Hammon as a witness, the Ohio courts have approved of this method as an appropriate manner to introduce such evidence. *State v. Adams*, 404 N.E.2d 144, 147-48 (Ohio 1980); *State v. Dacons*, 449 N.E.2d 507, 510 (Ohio Ct. App. 1982); *State v. Chavis*, Nos. 01AP-1456, etc., 2003 WL 231265, at *7-8 (Ohio Ct. App. Feb. 4, 2003). We agree

that the use of a court witness in such a circumstance does not, *ipso facto*, violate a defendant's constitutional rights.

We note that impeachment evidence, such as Hammon's prior statement, generally should be admitted only for the limited purpose of determining the witness's credibility. *See Dacons*, 449 N.E.2d at 510-11. The trial court did not issue an instruction so limiting the jury's consideration in this case; indeed, it appears that the prior statement was admitted for the substance of the subject matter addressed therein, rather than merely for impeachment purposes. Nevertheless, the admission of Hammon's statement, even if in error, was not so egregious as to deny Apanovitch a fundamentally fair trial. Our conclusion in *Shoupe* that the admission of a similar statement constituted a due process violation is distinguishable. Unlike the witness's prior statement in *Shoupe*, Hammon's prior statement would not have been sufficient, alone, to sustain Apanovitch's convictions. Indeed, the Ohio Supreme Court did not even refer to Hammon's statement in listing the evidence that supported Apanovitch's convictions. Therefore we find that the petitioner has not alleged a constitutional error with respect to this claim.

Apanovitch also argues that the prosecutor improperly referred to one Hans Graewe during its examination of Hammon. Apanovitch maintains that the prosecutor was going to assert that Graewe had threatened Hammon to repudiate his prior statement, but the prosecution withdrew the question following a defense objection. However, Apanovitch has never before raised this claim in any court, and so we will not consider it in the first instance. *Barner*, 399 F.3d at 749.

## C

The prosecution called six witnesses at trial to testify about statements made by the victim over a period of several months before her murder. The witnesses testified that Flynn was fearful of a "painter," and one of the witnesses identified Apanovitch by name. The petitioner now argues that this evidence constituted hearsay admitted in violation of due process. Although it could be argued that the appellant has defaulted with respect to this issue, the district court did not find that he had done so. Rather, the district court dismissed this claim on other procedural grounds, holding that the state courts' "judgment rests on a state-law ground that is both independent of the merits of the federal claim and an adequate basis for the court's decision."

The district court was mistaken in its analysis. The Ohio Supreme Court referred to state and federal evidentiary law in concluding that the claim was without merit. While the district court believed that the state court's reliance on state evidentiary law precluded federal review of the claim, the "adequate and independent" state rule doctrine is typically applied in the context of a procedural default analysis. *Lancaster*, 324 F.3d at 436-37; *Greer*, 264 F.3d at 673. As the state court did not conclude that a state procedural rule prevented review of Apanovitch's claim, the 'adequate and independent' doctrine does not appear applicable in this context, and we proceed to consider this claim.

In order to prevail on a claim that an evidentiary error deprived him of due process under the Fourteenth Amendment, the defendant must show that the error was so pervasive as to have denied him a fundamentally fair trial. *McAdoo*, 365 F.3d at 494. Apanovitch argues that the trial court improperly admitted hearsay testimony that reflected that the victim was fearful or apprehensive of him. The Ohio Supreme Court noted that the state evidence rule with respect to the state-of-mind hearsay exception is "identical to" the analogous federal rule. *State v. Apanovitch*, 514 N.E. 2d at 398 n.1. Rule 803(3) of the Federal Rules of Evidence states that

> A statement of the declarant's then existing state of mind, emotion, sensation, or physical condition (such as intent, plan, motive, design, mental feeling, pain, and bodily health), but not including a statement of memory or belief to prove the fact

> remembered or believed unless it relates to the execution, revocation, identification, or terms of declarant's will.

Fed. R. Evid. 803(3). That is to say, a witness may testify that someone expressed to them fear of someone or something, but they may not testify as to that person's explanations of *why* they were afraid. *United States v. Joe*, 8 F.3d 1488, 1492 (10th Cir. 1993); *United States v. Taylor*, Nos. 92-1875/1911, 1993 U.S. App. LEXIS 7566, at *9 (6th Cir. Mar. 29, 1993) ("Rule 803(3) carefully excludes statements of belief and for good reason.").

Six witnesses testified as to the victim's state of mind. Irene Heppner testified that the victim had been fearful of the man painting her house, and that she did not want him to come around anymore. Cynthia Damartzis related that the victim had been afraid and worried about the man painting her house because he had been "coming onto [sic] her." Jacqueline Sparks also testified that the victim had been afraid of Apanovitch. Jane Hillie testified that the victim had disliked and had been afraid of the painter because he would "come onto [sic] her" and appear at her house unexpectedly. Mary Cartwright-Smith stated that the victim had been upset and apprehensive about the painter, and that she had wished to stop him from painting her house any longer. Lastly, Alice Sparks indicated that "Tony" [Apanovitch] had been harassing the victim, who was made nervous and upset as a consequence. Therefore, the state trial court erred to the extent that it allowed some of the witnesses to elaborate on their testimony regarding the victim's stated fear of Apanovitch, or of a man who fit Apanovitch's description, by explaining that the victim had complained about Apanovitch's unrequited romantic advances toward her.

Nevertheless, an evidentiary error must have been so pervasive as to have denied a petitioner a fundamentally fair trial in order for the petitioner to prevail on a claim that such an evidentiary error amounted to a due process violation. *McAdoo v. Elo*, 365 F.3d at 494. In reviewing a similar evidentiary issue under AEDPA, we noted that no Supreme Court precedent existed that precluded, as violative of the defendant's due process rights, the admission of state-of-mind evidence that the murder victim feared the defendant. *Frazier v. Huffman*, 343 F.3d 780, 790 (6th Cir. 2003), *opinion supp. on denial of reh'g*, 348 F.3d 174, *cert. denied*, 541 U.S. 1095 (2004). Here, the testimony admitted in error was merely duplicative of the unchallenged testimony by Apanovitch's co-worker, who testified as to Apanovitch's sexual interest in the victim, and the bulk of the testimony – that the victim had expressed fear of a man who fit Apanovitch's description – was entirely appropriate under the state-of-mind exception. Therefore, we hold that Apanovitch has not demonstrated that the introduction of this evidence was so egregious as to deny him a fundamentally fair trial. As such, we deny this aspect of Apanovitch's appeal.

## D

Apanovitch claims that insufficient evidence existed to sustain his conviction. He raised this claim first with the state courts, so there is no issue of procedural default. The Ohio Supreme Court determined that this issue was without merit, and the district court likewise concluded that sufficient evidence existed to support Apanovitch's conviction.

Sufficient evidence exists to support a conviction if, after viewing the evidence in the light most favorable to the prosecution, the court can conclude that *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979). This requires successful challengers to meet a very high threshold, even with respect to newly-discovered evidence. *Schlup v. Delo*, 513 U.S. 298, 329 (1995) ("It is not the district court's independent judgment as to whether reasonable doubt exists that the standard addresses; rather the standard requires the district court to make a probabilistic determination about what reasonable, properly instructed jurors would do. Thus, a petitioner does not meet the threshold requirement unless he persuades the district court that, in light of the new evidence, no juror, acting

reasonably, would have voted to find him guilty beyond a reasonable doubt."). Circumstantial evidence may support a conviction, *McKenzie v. Smith*, 326 F.3d 721, 727 (6th Cir. 2003), and such evidence need not remove every reasonable hypothesis except that of guilt. *Walker v. Russell*, 57 F.3d 472, 475 (6th Cir. 1995). Under Ohio Rev. Code § 2903.01(B), a defendant commits aggravated murder if he purposely causes the death of another while committing or attempting to commit, *inter alia*, rape or aggravated burglary.

In affirming Apanovitch's aggravated murder conviction, the Ohio Supreme Court relied on the following pieces of evidence:

> (1) appellant had the same blood type as the perpetrator; (2) he had a scratch on the left side of his face consistent with that of a scratch from a fingernail; (3) appellant could not adequately account for his whereabouts on the night in question; (4) appellant's signed agreement to paint a portion of the victim's house was found on the kitchen table the day after the murder was discovered; (5) appellant was familiar with the peculiar layout of the victim's house; (6) appellant knew the victim and had made statements to others about his desire to have sexual relations with her; (7) the victim was fearful and apprehensive of appellant; (8) appellant spoke with the victim at approximately 4:00 or 4:30 p.m. on the day of the murder. (The subject of the discussion, according to appellant, was the offer to paint the windowsills. A portion of one of the sills was used to stab the victim in the neck.); (9) appellant told the police that it did not mean anything if they found his fingerprints in the house, even though he had painted only the exterior of the house; and (10) appellant offered a variety of inconsistent stories about his whereabouts on the night of the murder.

*State v. Apanovitch*, 514 N.E.2d at 399. We conclude from the evidence available at trial that a reasonable juror could have found that Apanovitch murdered Flynn while committing or attempting rape or burglary. Therefore we affirm the district court's denial of Apanovitch's insufficiency of evidence claim.

**E**

Finally, the state has repeatedly asked the federal courts to authorize it to conduct a comparison of Apanovitch's DNA to that found in the oral and vaginal swabs that were discovered in a drawer in the coroner's office in 1992. The state at first declared that it had lost or accidentally destroyed the physical evidence that could have been used to conduct a DNA test. Apanovitch then demanded a DNA test of the supposedly-destroyed swabs, and claimed in his habeas petition's ninth ground for relief that the state had violated his constitutional rights by not preserving the evidence. After the state rediscovered the swabs – after the habeas petition was filed but before the district court ruled on the petition – it conducted a DNA test of the material, and then asked the district court to authorize a test of Apanovitch's DNA and a comparison of his DNA to that found on the swabs. Apanovitch then decided that he did *not* wish to access the DNA evidence or have it placed before the district court, and so he objected to that request. The district court subsequently denied Apanovitch's habeas petition in its entirety, and in so doing it additionally denied the state's motion as moot. Apanovitch continues to raise objections to the state's request, arguing first that the test would be inaccurate and unreliable, and second, that the chain of custody is questionable. It is unclear to us whether any of the DNA material survived the testing, and the exact nature of the test results of the DNA evidence, as well as the chain of custody, remains murky. We suspect that the DNA evidence, should it be introduced and subjected to appropriate evidentiary challenges in court, might help resolve lingering questions of whether Apanovitch suffered actual prejudice when the state withheld the serological evidence, and whether Apanovitch's innocence claim can be

verified.**[10]** We note that Apanovitch could well benefit from any ambiguity or error in the results that might lessen the exact accuracy of any hypothetical match with his own DNA. But these are issues better suited to the district court. Therefore, we reverse the district court with respect to Apanovitch's ninth ground for habeas relief and the state's DNA request, and we remand for that court's further adjudication. In so doing, we note that the district court retains the inherent authority to conduct an evidentiary hearing with respect to the DNA evidence should it deem that course of action to be appropriate.

IV

We **REVERSE** the district court with respect to its denial of certain aforementioned elements of Apanovitch's petition and third motion to expand the record, and **REMAND** those specified aforementioned issues to the district court for further adjudication. We also **REVERSE** the district court's denial of the state's motion to compare the DNA results to the petitioner's DNA, and, accordingly, **REMAND** on this issue as well. We **AFFIRM** the district court's denial with respect to the remaining issues raised by Apanovitch. On remand, we note that the district court retains the inherent authority to conduct an evidentiary hearing should it determine that further fact development is necessary and appropriate.

---

**[10]** Although Apanovitch now denies that he is claiming actual innocence in order to avoid a DNA test or an evidentiary hearing with respect to the DNA evidence, he has clearly claimed innocence in his prior submissions to the district court. In his original habeas petition, he suggested that the circumstantial evidence adduced at trial "leads to a reasonable hypothesis of innocence." Moreover, in his first set of amendments to his habeas petition, he argued that the unknown hair found on Flynn's body "could only be hair [sic] belonging to the individual who raped and murdered Mary Anne Flynn." Furthermore, in his response opposing the state's first DNA test request, Record 32, Apanovitch argued that "Petitioner was indicted, convicted and sentenced to death for the murder of Mary Ann [sic] Flynn, a murder he did not commit." Apanovitch cannot first claim actual innocence before the district court, and subsequently drop those claims, simply to suit his tactical needs, and we are not precluded from reviewing his innocence claims in our *de novo* review of the district court's order. Of course, it would be inappropriate for us to conduct an evidentiary hearing ourselves, but we believe the district court retains ample inherent authority under a pre-AEDPA standard to conduct an evidentiary hearing on this matter if appropriate, taking the DNA evidence into consideration should that be deemed necessary.